---

GRANDE VILLAGE LLC, GRANDE
PROPERTIES, LLC, WILLINGBORO
TOWN CENTER URBAN RENEWAL
NORTH, LLC, WILLINGBORO TOWN
CENTER NORTH MANAGER, LLC,
WILLIAM T. JULIANO, and
THOMAS E. JULIANO,

        Plaintiffs,

    v.

CIBC INC. and CANADIAN
IMPERIAL BANK OF COMMERCE,
NEW YORK AGENCY,

        Defendants.

No. 1:14-cv-3495 (NLH/JS)

---

---

CIBC INC. and CANADIAN
IMPERIAL BANK OF COMMERCE,
NEW YORK AGENCY,

        Plaintiffs,

    v.

GRANDE VILLAGE LLC, GRANDE
PROPERTIES, LLC, WILLINGBORO
TOWN CENTER URBAN RENEWAL
NORTH, LLC, WILLINGBORO TOWN
CENTER NORTH MANAGER, LLC,
WILLIAM T. JULIANO, and
THOMAS E. JULIANO,

        Defendants.

No. 1:14-cv-5047 (NLH/JS)

**OPINION**
**(redacted)**

---

**APPEARANCES**:

DAVID L. BRAVERMAN
BENJAMIN ALEX GARBER
PETER J. LEYH
BRAVERMAN KASKEY, P.C.
ONE LIBERTY PLACE, 56TH FLOOR
1650 MARKET STREET
PHILADELPHIA, PA 19103
       On behalf of Grande Village LLC, Grande Properties, LLC,
       Willingboro Town Center Urban Renewal North, LLC,
       Willingboro Town Center North Manager, LLC, William T.
       Juliano, and Thomas E. Juliano (Plaintiffs in the 14-3495
       action and Defendants in the 14-5047 action)

ADAM K. DERMAN
DAVID M. DUGAN
CHIESA SHAHINIAN & GIANTOMASI PC
THE OFFICES OF CRYSTAL LAKE
ONE BOLAND DRIVE
WEST ORANGE, NJ 07052
       On behalf of CIBC Inc. and Canadian Imperial Bank of
       Commerce, New York Agency (Defendants in the 14-3495 action
       and Plaintiffs in the 14-5047 action)

**HILLMAN**, District Judge

This is a breach of contract matter involving various loan and mortgage documents secured for retail space in New Jersey. This summary judgment motion relates to two dockets open before the Court: Docket No. 14-3495 ("the 14-3495 action") and Docket No. 14-5047 ("the 14-5047 action").[1]  For the reasons that follow, the Court will grant summary judgment in part, and deny summary judgment in part.  The Court will further sua sponte

---

[1]    These cases were consolidated on January 21, 2015 for discovery and case management purposes only.

2

consolidate these matters pursuant to Federal Rule of Civil Procedure 42(a) for all purposes. The remaining claims in both actions will proceed in a consolidated bench trial before this Court.[2]

## I. Background

The Court begins by briefly introducing the relevant parties in these matters. CIBC Inc. is a New York corporation, and Canadian Imperial Bank of Commerce, New York Agency is a New York branch office of Canadian Imperial Bank of Commerce. These are the lenders on the loan and mortgage documents in these matter. The Court will refer to these entities jointly as "CIBC."[3]

Grande Village LLC ("Grande Village"), Grande Properties,

---

[2] Both parties have filed motions to seal certain documents submitted in support of their respective motions. This Court is funded by the public treasury and does not sit to resolve private disputes in secret. There exists a strong public interest in access to court proceedings. In an exercise of caution, the Court on its own initiative filed this Opinion under temporary seal and allowed the parties to request redactions of this Opinion for public filing. Redactions were requested on April 16, 2018. On May 4, 2018, this Court issued an Order to Show Cause, ordering the parties to demonstrate a legal basis for their proposed redactions. In response to the Juliano Parties' May 11, 2018 letter, the Court is adopting the redacted version of this Opinion suggested in the May 11, 2018 letter. The Juliano Parties are directed to file the May 11, 2018 letter, but not the accompanying exhibits, on the docket.

[3] In a number of documents quoted from in this Opinion, CIBC is referred to as "Lender."

LLC ("Grande Properties"), Willingboro Town Center Urban Renewal North, LLC and Willingboro Town Center North Manager, LLC (collectively "Willingboro") are limited liability companies whose sole members are William Juliano and Thomas Juliano.[4]  The Court will refer to these four limited liability companies, together with William Juliano and Thomas Juliano, as "the Juliano Parties."[5]

## A. The Initial Loan Documents

### 1. The Willingboro Loan

A Construction Loan Agreement was entered into on September 14, 2007 between Willingboro as borrower and CIBC as lender (the "Willingboro Loan Agreement").  The Willingboro Loan Agreement was for the Willingboro Town Center and was for the amount of $6,200,000.  The loan was secured by a mortgage, as well as performance and payment guaranties executed by William Juliano and Thomas Juliano.

The Willingboro Loan Agreement required the furnishing of the following financial information:

- Annual financial statements for Borrower

- Annual financial statements for Guarantors

---

[4]     William Juliano and his son Thomas Juliano are real estate developers who operate primarily in Southern New Jersey.
[5]     In a number of documents quoted from in this Opinion, Grande Village, Grande Properties, and Willingboro are referred to as "Borrowers."  In these documents, William Juliano and Thomas Juliano are often referred to as "Guarantors."

- Annual financial covenants certifications for Guarantors

- Annual operating budgets

- Monthly unaudited financial statements and operating cash flow statements

- Quarterly certificates of the principal financial or accounting officer stating that no default or event of default which has occurred is continuing

- Such additional financial information reasonably required

## 2. The Grande Properties Loan

A Construction Loan Agreement was entered into on May 15, 2008 between Grande Properties as borrower and CIBC as lender (the "Grande Properties Loan Agreement"). The Grande Properties Loan Agreement was for an aloft Hotel project and was for the amount of $32,200,000. The loan was secured by a mortgage, as well as performance and payment guaranties executed by William Juliano and Thomas Juliano.

The Grande Properties Loan Agreement required the furnishing of the following financial information:

- Annual financial statements for Borrower

- Annual financial statements for Guarantors

- Quarterly financial covenant certifications for Guarantors

- Annual financial covenant certifications for Guarantors

- Annual operating budgets

- Monthly unaudited financial statements and operating cash flow statements

- Quarterly certificates of the principal financial or accounting officer stating that no default or event of default has occurred and is continuing

- Such additional financial information reasonably required

### 3. The Grande Village Loan

A "Mortgage, Assignment of Leases and Rents and Security Agreement" was entered into on November 10, 2008 between Grande Village as borrower and CIBC as lender (the "Grande Village Loan Agreement"). The Grande Village Loan Agreement was for the amount of $8,400,000. The Grande Village loan documents provided for an initial advance of $6,365,500, plus an additional advance of $2,034,500 for capital improvements (the "Subsequent Advance"). The loan was secured by a mortgage, as well as performance and payment guaranties executed by William Juliano and Thomas Juliano.

The Grande Village Loan Agreement required the furnishing of the following financial information:

- Copies of all tax returns filed by Borrower

- Monthly operating statements for the property

- Quarterly operating statements for the property

- Annual balance sheets for the property

- Annual financial statements

- A current rent roll

- Such additional financial information reasonably required

Exhibit B to the Grande Village Loan Agreement was entitled "Future Advances." Section 1 of Exhibit B, entitled "Timing and Method of Advances," provided that the amount of $6,365,500 represented the "Initial Advance," which "represent[ed] a portion of the principal amount of the Loan." It further provided:

> Subsequent to the date hereof, Lender by its acceptance of this Mortgage, agrees to lend, and Borrower agrees to borrow, up to the principal amount of $2,034,500 (the "Subsequent Advance[,"] such amount being the difference between the face amount of the Note and the amount of the Initial Advance) and shall be used by Borrower solely to pay for Approved Costs (as that term is hereinafter defined), subject to all of the terms, conditions, and agreements contained in the Loan Documents and in this Exhibit B.

Section 2 of Exhibit B, entitled "Approved Costs," defined what constituted approved costs under Section 1:

> At any time and from time to time during the term of the Loan Borrower may request an Advance . . . to pay for the costs of capital improvements and renovations to the Property . . . pursuant to plans and specifications delivered to and approved by Lender in accordance with this Exhibit B . . . and in accordance with a budget for each Capital Improvement undertaken by Borrower, which shall be subject to Lender's prior approval . . . .

Section 4 provides several conditions precedent to the disbursement of the Subsequent Advance. Section 14 further provides that "Advances shall only be made in connection with

7

costs incurred by Borrower for Approved Costs.  Borrower agrees
that all Advances shall be used only for payment of Approved
Costs for which such Advances were made."

Section 13 governs the "Deficiency Deposit" requirement and
provides as follows:

> If at any time, the projected cost of any individual
> Budget Line Item exceeds the amount set forth in the
> Budget for such individual Budget Line Item, as
> determined by Lender in its reasonable discretion, then
> Borrower shall, at Lender's request, deposit with Lender
> within five (5) days of such request cash in an amount
> sufficient to cover such deficiency . . . . Lender shall
> not be required to make any Advance before receiving
> payment of any such Deficiency Deposit and the prior
> application of any such Deficiency Deposit to the
> payment of the cost of the Approved Costs.

### 4. Transfer from the Real Estate Finance Group to Special Loans

From the date of inception through July 2013, the loans
were managed by CIBC's Real Estate Finance group (REF).  On
July 29, 2013, CIBC transferred the loans from REF to Special
Loans, a department of CIBC's credit risk management.  At the
time the loans were transferred from REF to Special Loans,
the loans were current on payments owed to CIBC.  The
reasoning behind the transfer to Special Loans is a point of
contention between the parties and will be addressed below.

### B. Performance and Payment Guarantees

A September 14, 2007 "Performance and Completion Guaranty"
was executed between William Juliano and Thomas Juliano, as

guarantors, and CIBC with regard to the Willingboro Loan
Agreement.  It provided that the guarantor was required to
maintain a net worth of at least $60,000,000 at any date of
determination.  The September 14, 2007 "Payment Guaranty"
similarly detailed this net worth requirement.  A May 15, 2008
"Performance and Completion Guaranty" and "Payment Guaranty"
executed between the same parties with regard to the Grande
Properties Loan Agreement required similarly but with a net
worth requirement of $70,000,000.  A November 10, 2008
"Performance and Completion Guaranty" with regard to the Grande
Village Loan Agreement similarly required a net worth of at
least $60,000,000.

### C. Loan Modifications, Cross-Default, and Cross-Collateralization Agreements

On July 21, 2011, CIBC and the Juliano Parties entered into
several agreements to modify the loans – a "Mortgage
Modification, Cross-Collateralization, Cross-Contribution and
Cross-Default Agreement" (the "Cross-Collateralization
Agreement") as well as three separate loan modification
agreements.  Among other modifications, the agreements cross-
collateralized the loans and extended the original maturity
dates to May 10, 2013.  In addition to setting a common extended
maturity date of May 10, 2013, the loan modification agreements
also provided the Juliano Parties with an opportunity to extend

the maturity date up to three times, in twelve-month increments, in the event they satisfied certain historical financial performance tests.  The latest point in time to which the maturity date could be extended under the terms of the loan modification agreements, absent amendment or modification, was May 10, 2016.

The Cross-Collateralization Agreement provided that an event of default under any of the loan documents constituted an event of default under all of the loan documents.  It further held that all collateral held under any of the loan documents also secured the obligations under the other loan documents.

Pursuant to the Cross-Collateralization Agreement, the aggregate principal amount under the loans was $46,800,000.  The loan modification agreements also reduced the net worth requirement for William Juliano and Thomas Juliano to $15,000,000.  The modification agreements further placed caps on the payment guaranties and required the Juliano Parties "provide monthly operating statements for the Property."

**D. The State and West Marine Leases**

In early 2013, Grande Village procured two new commercial leases at the Grande Village Center – one with West Marine Products, Inc.[6] (the "West Marine Lease") and one with the State

---

[6]    West Marine Products, Inc. is a specialty retailer of boating supplies and accessories.

of New Jersey[7] (the "State Lease").  Both leases were executed in August 2013, and both required Grande Village construct significant tenant improvements to fit out the property within a set timeframe, at the risk of penalties.

The West Marine Lease provided that the "Landlord shall use reasonable efforts to cause the Delivery Date to occur on or before February 3, 2014."  Pursuant to the West Marine Lease, "[i]f the Delivery Date does not occur by March 1, 2014," certain monetary penalties would apply.

The State Lease provided that, if the premises "are not ready for acceptance in accordance" with a schedule set between the parties, "the State shall be entitled to cancel the Lease upon ten (10) days' prior written notice to the Lessor."  The State Lease also provided for liability "for the State's damages and injuries stemming from the delay."

### E. Loan Modification Negotiations and Agreements

The Juliano Parties initiated negotiations with CIBC on May 7, 2013, with a letter from Thomas Juliano to CIBC.  Thomas Juliano stated:

> As you know, we currently have two leases in our possession for Grande Village.  I have attached our contractors estimate for the work, as well as a spreadsheet that shows other costs we estimate

---

[7]     The State of New Jersey agreed to lease space to be used by the Department of Labor, Workforce Development or other State agencies.

(architect fees, broker commissions etc[.]). The total estimated cost is $3,120,000. Currently there is approximately $1,980,000 available to fund the construction, which leaves us approximately $1,140,000 short. There is over $494,000 in escrow at this time. We also estimate that between now and August you will receive approximately $350,000 (conservatively) in excess cash flow.

We propose that these proceeds along with the Julianos providing the difference of approximately $300,000 be used to complete the construction and fit out of West Marine and the Department of Labor – provided that upon completion of the fit out – we are able to take CIBC out of this deal for $8,700,000. This will get the Bank whole on this site and leave the Bank with the aloft and Willingboro.

. . . .

. . . [H]ere is the bottom line. We are offering CIBC a way out of this deal. We will be taking the risk to fill the Office Depot in two years. If we don't work something out, there is no way we can get you whole. I don't think we could get you much more than $4,000,000 for this site today. If you advance us the fit out money (which is required under the loan) and we put in some of the shortfall we can take the bank out at the end of construction. We have lined up some hard money lenders to do this. It is the only way we could get the bank out. Most lenders will not finance this deal with the Office Depot lease expiring in two years.

Following this letter, CIBC and the Juliano Parties entered

into a May 13, 2013 Agreement to govern their negotiations, in

which the following was agreed upon:

The parties hereto wish to have discussions and other communications . . . about (a) the parties' rights, obligations and performance under the Note, the Security Instrument, the other Loan Documents and the Modification Documents; (b) a possible restructuring or other resolution or modification of the Loan or the Loans . . . ; (c) CIBC's conditions or requirements for any Modification; (d) the status and future of the Property, the Loan and the Loans; and (e) any other matter relating

to the Property, the Loan or the Loans that may arise in connection with the foregoing.

> . . . .

> . . . Our contemplated Discussions may be lengthy and complex. <u>While we may reach agreement on one or more preliminary issues involving the Loan or the Loans, we all agree that no party hereto shall be bound by any agreement on any issue(s) until such agreement is reduced to a written agreement which is executed by each of CIBC, Borrower and the Guarantor.</u> . . .
>
> Any party hereto may, in its sole and absolute discretion, prepare a term sheet or any other written proposal or outline (any of the foregoing, a "Term Sheet") for further Discussion and possible preparation of draft documents. <u>Any Term Sheet is for discussion only. No Term Sheet or any preparation, distribution, response, or failure to respond to it shall constitute any party's offer, agreement, or commitment to enter into a Modification.</u>

(emphasis added).

In a May 13, 2013 Memorandum from CIBC to the Juliano Parties, CIBC made a counterproposal to the Juliano Parties' first attempt at negotiations:

> As sanctioned in the pre-negotiation letters (executed on May 13, 2013) with respect to the subject loans, please find below terms for DISCUSSION PURPOSES ONLY for a proposed modification of the terms of the subject loans, which together make up the cross-collateralized loan group.
>
> We believe that the proposed State of New Jersey and West Marine tenants are accretive in value to the property and we support your efforts to finalize their leases. To facilitate the financing of the proposed costs to construct and fit out these respective tenants' proposed space, we present the below terms for DISCUSSION PURPOSES ONLY.

The May 13, 2013 Memorandum went on to state, with reference to the Grande Village property, a "Listing for Sale" term and a

"Sales Proceeds" term:

Listing for Sale:    Upon the event of both the State of New Jersey and West Marine taking occupancy (expected May 2014), the property shall be listed for sale with a national third party brokerage firm, and sold within the six months thereafter.

Sales Proceeds:    As Is – upon sale of the property, all excess proceeds from the sale shall be used to reduce the debt on Willingboro and Grande Properties (aLoft).

In a July 23, 2013 e-mail from the Juliano Parties to CIBC, the Juliano Parties stated: "The old term sheet is in no way appealing to us at all. So that is a non starter for us." Thus, the Juliano Parties rejected the May 13, 2013 term sheet.

A December 20, 2013 Summary Term Sheet, entitled "Extension of Grande Village LLC Loan," contained a section entitled "Sales Process." It stated, in pertinent part:

Promptly upon receipt of a certificate of occupancy with respect to the leases with West Marine Products, Inc. and the State of New Jersey (but in no event later than April 30, 2014), the Borrower shall retain a real estate broker . . . to market and sell the Property and shall thereafter continue the retention of the Broker at all times any portion of the Loan remains outstanding.

It further provided, in all caps (removed):

This term sheet is for discussion purposes only as an indication of the general parameters of a potential transaction and does not constitute, and should not be construed in any way as, a commitment on the part of any lender in connection with the transactions described herein on the terms described herein or otherwise. Such a commitment would require, among other things,

additional due diligence and other necessary reviews, as
well as receipt of all necessary internal approvals.
The terms and conditions contained herein are indicative
only and do not represent actual terms and conditions
agreed to by any party. This term sheet does not purport
to contain all transaction terms and terms contained
herein are subject to modification.

Grande Village rejected the December 20, 2013 Summary Term Sheet

later that month.  In the e-mail rejecting the proposal, the

Juliano Parties proposed "that it pay off the loan in 60 days at

$5,200,000.00, which is a discount but which provides a

substantial return of CIBC's loan."  CIBC rejected this offer,

stating "a discounted payoff on the Grande Village loan does not

work for CIBC."

While negotiations continued into 2014, the parties failed

to successfully negotiate any further modifications for the loan

agreements.[8]

**F. Budget Approval and Request for Subsequent Advance**

During the negotiations described above, the Juliano

Parties sent a November 8, 2013 letter to CIBC regarding the

Grande Village property to initiate the process of obtaining the

Subsequent Advance funds.  They also provided what CIBC argues

---

[8]     The parties were continuing to negotiate even as late as
March 2014.  On March 26, 2014, roughly a month before the 14-
3495 complaint was filed, William Juliano e-mailed CIBC
reiterating its hope that CIBC would accept a $5.2 million
offer.  CIBC responded on March 28, 2014, stating it was "not
prepared to accept a situation where CIBC incurs a loss and
releases the collateral and guarantees."

was the first proposed budget for the capital improvements.[9]  It

stated:

> As you know, Borrower has entered into leases with
> West Marine Products, Inc. and the State of New Jersey
> to lease space in the Property.  Borrower has submitted
> copies of the leases to Lender, and Lender has approved
> the same.  Both leases require the Borrower to construct
> significant tenant improvements as a condition to the
> commencement of rent under the leases.  In addition,
> Borrower will incur lasting commissions in connection
> with the leases.  To fund the tenant improvements and
> the leasing commissions, Borrower hereby requests that
> the Lender fund the Subsequent Advance and funds in the
> Leasing Reserve.
>
> Pursuant to Exhibit "B," enclosed is a Budget
> showing the Approved Costs.  As you can see, the total
> budgeted costs are $2,488,220.00, $2,274,035.40 of which
> will be funded from the Subsequent Advance and the
> Leasing Reserve, and the balance of which will be funded
> from Borrower's own funds.  Borrower hereby requests
> that Lender approve the enclosed Budget.

CIBC responded by way of a November 12, 2013 letter.  CIBC

reiterated that "the Mortgage contemplates that Subsequent

Advances and funds in the Leasing Reserve are only available

following the incurrence of the costs and expenses associated

with Capital Improvements or Approved Leasing Costs."  CIBC also

referenced the need for CIBC to satisfy the conditions precedent

in Exhibit B.  As CIBC "underst[ood] that, to date, the Borrower

had not incurred any costs and expenses associated with Capital

---

[9]     Exhibit B elaborates on the required budget as follows:
"The budget shall include line items . . . for the cost of all
labor, materials and equipment to be used in constructing and
completing the Capital Improvements . . . ."  The Juliano
Parties argue they submitted earlier budgets in 2012 and earlier
in 2013.  The Court discusses these purported budgets below.

Improvements and/or Approved Leasing Costs," among other Exhibit B conditions precedent, CIBC stated it would not advance the Subsequent Advance funds at that time.  In so deciding, CIBC announced its intention to employ a Construction Consultant[10] and to require the funding of a Deficiency Deposit if necessary:

> We further note that the "Project Total Cost" as set forth in your proposed budget exceeds the amount of the Subsequent Advance and the funds in the Leasing Reserve by not less than $214,184.60 (and far more if CIBC's records regarding the balance of the Leasing Reserve are accurate).  To the extent that the budget is approved and expenses are incurred, CIBC shall require that the Borrower deposit an amount equal to the deficiency in a cash collateral account maintained at CIBC, which account shall be first used to pay any Capital Improvements and/or Approved Leasing Costs.
>
> Moreover, prior to extending any Subsequent Advance or releasing funds from the Leasing Reserve, CIBC intends to employ a Construction Consultant.  Please confirm that the Borrower will pay the costs and expenses of the Borrower's Construction Consultant in accordance with Sections 11 and 15 of Exhibit B to the Mortgage. Please also confirm that the Borrower will pay all other costs, expenses and fees identified in Section 15 and 16 of Exhibit B to the Mortgage.

The Juliano Parties responded, in turn, by way of a November 18, 2013 letter, stating that the November 8, 2013 letter "was not intended to request that the Lender immediately disburse the Subsequent Advance . . . without incurring costs" and that the Juliano Parties "intend[ed] to follow Exhibit B." The Juliano Parties further advised that they had "incurred

---

[10]  Pursuant to Section 11 of Exhibit B, CIBC was permitted to employ a "Construction Consultant" to "review all matters related to any Advance."

various costs on account of the Capital Improvements."  They informed CIBC that "[s]ite work costs of approximately $850,000 attributable to this portion of the project have been spent to date, along with soft costs of over $189,000 for plans, engineering and commissions for the new leases.  The Juliano Parties thus requested "reimbursement of the soft costs."  The Juliano Parties also reiterated their request for approval of the budget, indicated their willingness to fund a Deficiency Deposit if necessary, and further indicated their willingness to "pay CIBC's reasonable costs for a Construction Consultant and all other reasonable costs, expenses and fees identified in Sections 15 and 16 of Exhibit B."

From this point forward, CIBC – with the aid of its employed Construction Consultant, Property Solutions, Inc.[11] – began the budget approval process, further detailed later in this Opinion.  The review was received by CIBC on January 20, 2014.  CIBC approved the Budget on January 21, 2014.

After the January 20, 2014 budget approval, the Juliano Parties did not again request disbursement of the Subsequent Advance funds.  Accordingly, such funds were never advanced.

### G. CIBC Declares Default

By way of a February 14, 2014 letter, CIBC informed the

---

[11]    The Juliano Parties approved the Construction Consultant on December 11, 2013.

Juliano Parties CIBC "ha[d] not received copies of William Juliano's personal financial statements and the Borrowers remain out of compliance with various other financial reporting requirements under the loan documents, including without limitation delivery of the annual rent rolls."

CIBC sent three Default Notices on March 3, 2014 "intended to serve as written notice" of default. The Willingboro Default Notice stated, in pertinent part:

> Please be advised that the Lender has not received (i) ECF Statements with respect to the months ended October 2013, November 2013 and December 2013, (ii) Annual Financial Statements for the year ended 2012, (iii) Guarantor Annual Financial Statements from William T. Juliano for the year ended 2012, (iv) Quarterly Financial Covenant Certifications for the quarters ended March 2013, June 2013 or September 2013, (v) Annual Financial Covenant Certifications for the year ended 2012, (vi) the Operating Budget for 2014, (vii) complete Monthly Reporting packages for January 2014 and throughout 2013. As a result, certain Defaults have occurred under the Loan Agreement and related Loan Documents.

The Grande Properties Default Notice stated, in pertinent part:

> Please be advised that the Lender has not received (i) ECF Statements with respect to the months ended October 2013, November 2013 and December 2013, (ii) Annual Financial Statements for the year ended 2012, (iii) Guarantor Annual Financial Statements from William T. Juliano for the year ended 2012, (iv) Quarterly Financial Covenant Certifications for the quarters ended March 2013, June 2013 or September 2013, (v) Annual Financial Covenant Certifications for the year ended 2012, (vi) the Operating Budget for 2014, (vii) complete Monthly Reporting packages for January 2014 and throughout 2013. As a result, certain Defaults have

occurred under the Loan Agreement and related Loan
Documents.

The Grande Village Default Notice stated, in pertinent
part:

> Please be advised that the Lender has not received (i)
> ECF Statements with respect to the months ended October
> 2013, November 2013 and December 2013, (ii) Quarterly
> Operating Statements with respect to the quarter ended
> September 2013, (iii) a certified Annual Rent Roll as of
> January 1, 2013 or (iv) certified financial statements
> from William T. Juliano for the year ended 2012. As a
> result, certain Defaults have occurred under the
> Mortgage and related Loan Documents.

### H. Extending the Maturity Date of the Loans

On April 9, 2014, the Juliano Parties provided notice that
they were extending the maturity date of the loans "from May 10,
2014 to May 10, 2015 which represents the Second Extension
Term."[12]

CIBC found the April 9, 2014 letters were not sufficient to
extend the maturity dates. On April 17, 2014, CIBC sent a
letter identifying multiple conditions to the extension of the
maturity date and identifying documents from the March 3, 2014
default notices that still had not been provided. By way of a
May 7, 2014 letter, CIBC informed the Juliano Parties that "the
Maturity Date[s] shall not be extended and remain[] May 10,
2014."

---

[12] The maturity date was previously extended for the first
extension term – May 10, 2013 to May 10, 2014.

**I. Loan Sale Agreement**

The July 2011 loan modifications included an accompanying letter agreement ("Loan Sale Agreement") outlining the parties' respective rights and obligations in the event CIBC were to consider a sale of the loans. The July 21, 2011 letter provided, in pertinent part:

1. If CIBC is considering the sale of any or all of the Loans, . . . CIBC will give written notice to the Borrowers and Guarantor specifying the Loan or Loans that may be sold . . . .

2. If any Borrower or Guarantor wishes to bid to purchase such Loan(s), such bid . . . must be submitted in writing to CIBC within thirty (30) days after CIBC sends the Potential Loan Sale Notice, specifying the price to be paid for the Loan(s) . . . .

    . . . .

4. If . . . no Juliano Bid is submitted within the 30-day period after CIBC sends the Potential Loan Sale Notice, . . . then on written notice from CIBC in each such case this letter agreement shall be null and void and of no further force and effect with respect to the Loan(s) that were the subject of the Potential Loan Sale Notice, and CIBC shall be under no further restrictions pursuant to this letter agreement whatsoever with respect to the sale of such Loan(s) . . . .

CIBC provided a "Potential Loan Sale Notice" on September 15, 2014. It stated, in pertinent part:

CIBC has determined to consider a sale of the Loans, both individually and collectively. This letter constitutes a Potential Loan Sale Notice pursuant to Paragraph 1 of the Letter Agreement. Accordingly, CIBC may engage in any and all activities related to any such sale but, of course, is under no obligation to do so.

> If any Borrower or any Guarantor wishes to bid on
> the Loans, whether individually or collectively (a
> "Juliano Bid"), such bid(s) must be submitted to CIBC
> within thirty (30) days after the date hereof and
> otherwise pursuant to the terms and conditions of the
> Letter Agreement, including, without limitation, the
> Juliano Bid Requirements set forth in Paragraph 3
> thereof. CIBC is under no obligation to accept a Juliano
> Bid.

On October 6, 2014, the Juliano Parties filed an emergency application in the 14-3495 action to enjoin CIBC from selling the loans. This Court denied the Juliano Parties' application. The Juliano Parties did not place a bid. CIBC then sent the Juliano Parties a November 4, 2014 letter, advising that CIBC did not receive a bid from the Juliano Parties within the thirty-day period after the Potential Loan Sale Notice. Thus, CIBC declared the Loan Sale Agreement "null and void and of no further force and effect with respect to the Loans."

## J. Procedural Posture

The Juliano Parties' April 28, 2014 Complaint in the 14-3495 action brings four counts against CIBC: breach of contract (Count I), breach of the covenant of good faith and fair dealing (Count II), tortious interference with contract (Count III), and declaratory judgment (Count IV).

The Juliano Parties predicate their breach of contract claims on the following allegations in their complaint:

> 90. CIBC materially breached the terms of the Grande
> Village Mortgage by conditioning its approval to
> disburse the Subsequent Advance, the funds in the

Leasing Reserve and the excess monies held on account of insurance, upon the occurrence of events not required under the Loan Documents, namely, _inter alia_, a sale of the Grande Village Center.

91. CIBC materially breached the terms of the Grande Village Mortgage by refusing to reimburse Grande Village for the costs Grande Village has incurred in connection with the tenant improvements.

92. CIBC materially breached the terms of Loan Documents by improperly declaring the Borrowers in default on March 3, 2013 and April 17, 2014 based upon nonexistent technical defaults, including William and Thomas Juliano's purported failure to maintain a Net Worth of $15,000,000.00.

The Juliano Parties predicate their tortious interference with contract claim on the allegation that "CIBC intentionally and purposefully interfered with the Leases by . . . unreasonably delaying its approval of the budget and thereby preventing Grande Village from consummating its duties under the Leases, including the timely completion of the tenant improvements, and reaping the benefit of the rewards therefrom."

CIBC's October 2, 2014 Second Amended Complaint in the 14-5047 action brings six counts against the Juliano Parties: breach of notes and loan agreements (Count I), breach of payment guarantees (Count II), foreclosure (Count III), security interest foreclosure (Count IV), possession (Count V), and rent receiver (Count VI).  The Juliano Parties then filed counterclaims in the 14-5047 action as follows: violation of the New Jersey Consumer Fraud Act (Count I), breach of contract

(Count II), and breach of the implied covenant of good faith and fair dealing (Count III).  The Juliano Parties predicate their breach of contract counterclaim on an alleged breach of the Loan Sale Agreement by CIBC purportedly "declaring nonexistent, non-monetary technical defaults before noticing the sale of the notes in order to deprive the Juliano Parties of their rights under the Loan Sale Agreement and by declaring the Loan Sale Agreement null and void."  The Juliano Parties predicate their breach of the implied covenant of good faith and fair dealing claim on similar grounds and on the basis of CIBC allegedly "retaliating against the Juliano Parties by filing [the 14-5047] lawsuit" and "by seeking to collect more than $46,000,000.00 against the Guarantors who are not liable for such an amount, if any."

CIBC filed a July 2, 2014 Motion to Dismiss in the 14-3495 action, which this Court granted in part and denied in part on March 6, 2015.  Specifically, this Court found that, "[t]o the extent that plaintiffs allege that defendants breached the loan documents when they declared plaintiffs in technical default, plaintiffs' claim fails," as Plaintiffs did "not identif[y] what contract, or contractual provision, defendants allegedly breached."  However, the Court found "plaintiffs have met the elements of their breach of contract claim with regard to defendants' alleged breach of Exhibit B to the Grande Village

Mortgage." Accordingly, the breach of contract claim was permitted to proceed on those grounds. The Court also denied Defendants' motion to dismiss with regard to the Juliano Parties' other claims.

CIBC also filed a January 9, 2015 Motion to Dismiss the Juliano Parties' counterclaims in the 14-5047 action, which this Court granted in part and denied in part. Specifically, the Court dismissed the Consumer Fraud Act counterclaim, but allowed the breach of contract and breach of the implied covenant of good faith and fair dealing counterclaims to proceed.

These cases were consolidated by Magistrate Judge Joel Schneider on January 21, 2015 for discovery and case management purposes only. CIBC moved for summary judgment on May 2, 2016. The motion was administratively terminating and the case stayed as the parties pursued mediation. As the parties were unable to resolve their disputes through mediation, the Court administratively reinstated the summary judgment motion on May 18, 2017.

CIBC is moving for summary judgment in its favor both for the claims asserted against it in the 14-3495 action and the 14-5047 action, as well as for summary judgment on the claims it asserts against the Juliano Parties in the 14-5047 action.[13]

---

[13] As with all motions for summary judgment, this Court heavily relies on the Statements of Material Facts Not in

## II. Jurisdiction

This Court has diversity jurisdiction over both the 14-3495 matter and the 14-5047 matter pursuant to 28 U.S.C. § 1332. Grande Village LLC, Grande Properties, LLC, Willingboro Town Center Urban Renewal North, LLC, and Willingboro Town Center North Manager, LLC are all limited liability companies, whose sole members are William Juliano and Thomas Juliano. Both William Juliano and Thomas Juliano are citizens of New Jersey. Thus, all four entities are citizens of New Jersey, as are William Juliano and Thomas Juliano. CIBC is a corporation incorporated in Delaware with its principal place of business in

---

Dispute. As provided in Local Civil Rule 56.1, "[e]ach statement of material facts shall . . . not contain legal argument or conclusions of law." The parties' submissions are rife with ill-placed, inappropriate legal arguments and conclusions of law. The Court's local rules are clear that the Statements of Material Facts Not in Dispute are not places for legal arguments and conclusions of law. Such improper submissions "complicate the Court's task of distilling the factual record," rather than allowing the submissions to serve their intended purpose of "aiding the Court in its disposition" of a summary judgment motion. Teubert v. SRA Int'l, Inc., 192 F. Supp. 3d 569, 576 (D.N.J. 2016). The parties are reminded to abide by this important local rule in future submissions to this Court.

"[T]he Court relies on these Statements to the extent that the parties are in agreement as to a particular fact. Where the parties disagree, their respective statements cannot be reconciled, and they offer inappropriate or unhelpful hyperbole, the Court relies on the record. De law Torre v. Lockheed Martin Corp., No. 13-127, 2014 WL 2931268, at *1 n.4 (D.N.J. June 30, 2014).

New York.  Canadian Imperial Bank of Commerce is a banking corporation incorporated in Canada with its principal place of business in Canada.  Accordingly, there is complete diversity between the parties and the amount in controversy is in excess of $75,000, exclusive of interests and costs.  This Court thus has diversity jurisdiction over these matters pursuant to 28 U.S.C. § 1332.

### III. Summary Judgment Standard

Summary judgment is appropriate where the Court is satisfied that "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any,' . . . demonstrate the absence of a genuine issue of material fact" and that the moving party is entitled to a judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and

all justifiable inferences are to be drawn in his favor.'"
Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)
(citing Anderson, 477 U.S. at 255).

Initially, the moving party bears the burden of
demonstrating the absence of a genuine issue of material fact.
Celotex, 477 U.S. at 323 ("[A] party seeking summary judgment
always bears the initial responsibility of informing the
district court of the basis for its motion, and identifying
those portions of 'the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the
affidavits, if any,' which it believes demonstrate the absence
of a genuine issue of material fact."); see Singletary v. Pa.
Dep't of Corr., 266 F.3d 186, 192 n.2 (3d Cir. 2001) ("Although
the initial burden is on the summary judgment movant to show the
absence of a genuine issue of material fact, 'the burden on the
moving party may be discharged by "showing" – that is, pointing
out to the district court – that there is an absence of evidence
to support the nonmoving party's case' when the nonmoving party
bears the ultimate burden of proof." (citing Celotex, 477 U.S.
at 325)).

Once the moving party has met this burden, the nonmoving
party must identify, by affidavits or otherwise, specific facts
showing that there is a genuine issue for trial.  Celotex, 477
U.S. at 324.  A "party opposing summary judgment 'may not rest

upon the mere allegations or denials of the . . . pleading[s].'"

Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).  For

"the non-moving party[] to prevail, [that party] must 'make a

showing sufficient to establish the existence of [every] element

essential to that party's case, and on which that party will

bear the burden of proof at trial.'"  Cooper v. Sniezek, 418

F. App'x 56, 58 (3d Cir. 2011) (citing Celotex, 477 U.S. at

322).  Thus, to withstand a properly supported motion for

summary judgment, the nonmoving party must identify specific

facts and affirmative evidence that contradict those offered by

the moving party.  Anderson, 477 U.S. at 257.

If this case proceeds to trial, the remaining issues will

be tried before this Court in a bench trial.[14]  "When deciding a

motion for summary judgment, it is not our role to evaluate the

evidence and decide the truth of the matter, but to determine

whether there is a genuine issue for trial."  Rubin v.

Amerihealth Adm'rs, Inc., No. 12-3719, 2013 WL 3967569, at *8

(E.D. Pa. Aug. 2, 2013) (citing Anderson, 477 U.S. at 249).  "A

---

[14]    All three of the original loan documents contain a waiver
of the right to a jury trial, as do all three "Performance and
Completion Guaranties" and "Payment Guaranties."  The Cross-
Collateralization Agreement similarly contains a provision for
waiver of a jury trial.
    As of the date of this Opinion, a trial has been set for
July 2, 2018.  The docket entry inadvertently states this will
be a jury trial.  From a review of the record, however, it
appears both parties seek a bench trial.

judge does not sit as a trier of fact when deciding a motion for summary judgment even if the case is scheduled to be heard without a jury." Id. (quoting Stewart v. Bert Bell/Pete Rozelle NFL Player Ret. Plan, No. 12-3719, 2012 WL 122362, at *4 (D. Md. Jan. 12, 2012)). But see Chao v. Local 54, Hotel Emps. & Rest. Emps. Int'l Union, 166 F. Supp. 2d 109, 116 (D.N.J. 2001) ("While questions of 'reasonableness' involve a primarily factual inquiry, in a non-jury case, where the material evidentiary facts relating to the issue of 'reasonableness' have been fully developed in the record and are undisputed, the Court may appropriately grant summary judgment if a bench trial would not enhance its ability to draw inferences and conclusions." (citing Coats & Clark, Inc. v. Gay, 755 F.2d 1506, 1509-10 (11th Cir. 1985); Nunez v. Superior Oil Co., 572 F.2d 1119, 1123-24 (5th Cir. 1978))); Coleman v. Mfrs. Hanover Corp., No. 89-1249, 1990 WL 27370, at *5 n.4 (E.D. Pa. Mar. 14, 1990) ("To the extent that the court must draw inferences from the undisputed evidentiary facts to determine whether there has been prohibited discrimination, the court in a nonjury case is entitled to draw such inferences and conclusions on motions for summary judgment if a bench trial would not enhance its ability to draw those inferences and conclusions." (citing Coats & Clark, 755 F.2d at 1509-10; Nunez, 572 F.2d at 1123-24; Phillips v. Amoco Oil Co., 614 F. Supp. 694, 723 n.35 (D. Ala. 1985), aff'd, 799 F.2d 1164

(11th Cir. 1986))).

**IV.**

The Court will consider this summary judgment motion in three parts: the 14-3495 claims by the Juliano Parties against CIBC, the 14-5047 claims by CIBC against the Juliano Parties, and the 14-5047 counterclaims by the Juliano Parties against CIBC. As a roadmap for the lengthy discussion ahead, the Court will address the following issues still pending before this Court:

A. The 14-3495 claims by the Juliano Parties Against CIBC

    1. Breach of Contract
        a. Subsequent Advance Conditioned on Sale of the Property
        b. Use of a Construction Consultant
        c. Requiring Deficiency Deposit
        d. Refusal to Reimburse for Costs Incurred
    2. Breach of the Implied Covenant of Good Faith and Fair Dealing
        a. Declaring Defaults
        b. Subsequent Advance Conditioned on Sale of the Property
        c. Delay in Granting the Subsequent Advance
        d. Transfer to Special Loans
    3. Tortious Interference
    4. Declaratory Judgment

B. The 14-5047 Claims by CIBC Against the Juliano Parties

    1. Breach of Loan Agreements
        a. Extension of the Maturity Date to May 10, 2015
        b. Failure to Make Payments
    2. Breach of the Payment Guarantees
        a. Failure to Maintain Net Worth
        b. Failure to Make Payments

C. The 14-5047 Counterclaims by the Juliano Parties Against CIBC

1. Breach of the Loan Sale Agreement
2. Breach of the Implied Covenant of Good Faith and Fair Dealing

The Court begins first with the 14-3495 action claims by the Juliano Parties against CIBC.

## A. The 14-3495 Claims by the Juliano Parties Against CIBC

### 1. Breach of Contract

The Juliano Parties predicate their breach of contract claim on the following allegations in their complaint:

> 90. CIBC materially breached the terms of the Grande Village Mortgage by conditioning its approval to disburse the Subsequent Advance, the funds in the Leasing Reserve and the excess monies held on account of insurance, upon the occurrence of events not required under the Loan Documents, namely, <u>inter alia</u>, a sale of the Grande Village Center.

> 91. CIBC materially breached the terms of the Grande Village Mortgage by refusing to reimburse Grande Village for the costs Grande Village has incurred in connection with the tenant improvements.[15]

To prevail on a breach of contract claim under New Jersey law, a plaintiff must establish three elements: (1) the existence of a valid contract between the parties; (2) failure of the defendant to perform its obligations under the contract; and (3) a causal relationship between the breach and the

---

[15] As stated earlier in this Opinion, the Juliano Parties also based their breach of contract claim on the allegation that CIBC improperly declared default judgment against the Juliano Parties based on "nonexistent technical defaults." In its March 6, 2015 Opinion, the Court did not permit the breach of contract claim to proceed on those grounds.

plaintiff's alleged damages. <u>Sheet Metal Workers Int'l Ass'n</u>

<u>Local Union No. 27 v. E.P. Donnelly, Inc.</u>, 737 F.3d 879, 900 (3d

Cir. 2013). The first element – a valid contract, or contracts,

in this case – is not in dispute.

All of the Juliano Parties' bases for their breach of

contract claim relate to disbursement of the Subsequent Advance

funds. Section 1 of Exhibit B provided for a Subsequent Advance

up to the principal amount of $2,034,500 to "be used by Borrower

solely to pay for Approved Costs . . . subject to all of the

terms, conditions, and agreements contained in the Loan

Documents and in this <u>Exhibit B</u>." "Approved costs" were defined

as follows:

> At any time and from time to time during the term of the
> Loan Borrower may request an Advance . . . to pay for
> the costs of capital improvements and renovations to the
> Property . . . pursuant to plans and specifications
> delivered to and approved by Lender in accordance with
> this <u>Exhibit B</u> . . . and in accordance with a budget for
> each Capital Improvement undertaken by Borrower, which
> shall be subject to Lender's prior approval . . . .

Pursuant to Exhibit B, therefore, the Subsequent Advance

could issue to pay for approved costs, which were defined as

costs for capital improvements and renovations. The Subsequent

Advance was restricted to "costs incurred" by the Juliano

Parties. Such capital improvements and renovations must have

been approved by CIBC in accordance with a budget, which also

had to be approved by CIBC. In reviewing matters related to a

Subsequent Advance, CIBC was expressly permitted to employ a Construction Consultant.  A Deficiency Deposit was also required to be funded prior to disbursement of the Subsequent Advance in the event the cost of improvements exceeded the available Subsequent Advance funds.

None of the Juliano Parties' breach of contract claims will proceed to trial.

### a. Subsequent Advance Conditioned on Sale of the Property

The Court first looks to the Juliano Parties' argument that CIBC improperly conditioned the Subsequent Advance on the sale of the Grande Village property.  The Juliano Parties argue "CIBC breached its obligation to make the Subsequent Advance" when they "improperly conditioned the release of the Subsequent Advance funds upon the Juliano Parties agreement to sell the Grande Village property."  The Juliano Parties argue there was no basis in Exhibit B or any of the loan documents for this "condition precedent" to receiving the Subsequent Advance.  They argue "[t]he Loan Documents do not give CIBC the discretion to condition the advancement of monies for tenant improvements upon the sale of the very property that is to be improved (and at a loss)."

This allegation arises from the negotiations and correspondence between the parties made in an effort to modify

their arrangement.  The Court views these negotiations with particular reference to the May 13, 2013 Agreement entered between the parties, which was meant to govern the communications between the parties regarding potential modifications to the loan documents.  In pertinent part, it stated:

> While we may reach agreement on one or more preliminary issues involving the Loan or the Loans, we all agree that no party hereto shall be bound by any agreement on any issue(s) until such agreement is reduced to a written agreement which is executed by each of CIBC, Borrower and the Guarantor . . . .

It further stated: "Any Term Sheet is for discussion only.  No Term Sheet or any preparation, distribution, response, or failure to respond to it shall constitute any party's offer, agreement, or commitment to enter into a Modification."

With that in mind, the Court looks to the May 13, 2013 Memorandum from CIBC to the Juliano Parties.  Significantly, the Memorandum contains the preliminary statement that "we present the below terms for DISCUSSION PURPOSES ONLY."  The Memorandum went on to list a term for listing the Grande Village property for sale, where excess proceeds from the sale would be used to reduce the debt on Willingboro and Grande Properties.  This was ultimately rejected by the Juliano Parties.

A December 20, 2013 Summary Term Sheet also contained a term for marketing and selling the Grande Village property.

Like the May 13, 2013 Memorandum, the December 20, 2013 Summary Term Sheet stated it was "for discussion purposes only" and that it "does not constitute, and should not be construed in any way as, a commitment." It further stated: "The terms and conditions contained herein are indicative only and do not represent actual terms and conditions agreed to by any party." This was also rejected by the Juliano Parties.[16]

The Court finds that no reasonable factfinder could conclude that CIBC conditioned issuance of the Subsequent Advance on the sale of the Grande Village property in contravention of the terms of the loan agreements. The Juliano Parties argue in their opposition brief that "CIBC makes the preposterous argument that it never conditioned the disbursement of Subsequent Advance funds on the sale of the Grande Village Center." The Juliano Parties cite the May 13, 2013 Memorandum in support of this statement. Interestingly, the Juliano Parties reproduce the part of the Memorandum that emphasized that the terms were for "DISCUSSION PURPOSES ONLY."

The Juliano Parties also cite the December 20, 2013 Term

---

[16] The Court notes that while the May 13, 2013 Memorandum stated the terms were presented "[t]o facilitate the financing of the proposed costs to construct and fit out these respective tenants' proposed space," the December 20, 2013 Summary Term Sheet states that the terms are presented as "terms and conditions of an extension of the maturity of, and the terms of repayment of, that certain loan . . . made by CIBC Inc. . . . to Grande Village."

Sheet, which they acknowledge was a "proposal." The Juliano Parties argue "[t]o the extent that there is any ambiguity whatsoever about what CIBC meant by this language – and there should not be – that ambiguity must be resolved in the Juliano's favor now, and ultimately resolved by the fact-finder at trial." The Court finds no ambiguity. Rather it is clear that the proposed sale was a potential term suggested in the course of negotiations over the separate issue of the modification of the loan documents that was clearly intended for discussion purposes only.[17] As the Juliano Parties point to no other documents or communications that purportedly show CIBC conditioned the Subsequent Advance on the sale of the Grande Village property, the Court finds the Juliano Parties' breach of contract claim cannot proceed on this basis.

### b. Use of a Construction Consultant

---

[17]     When CIBC approved the budget on January 21, 2014, an e-mail exchange between the parties confirmed that the Subsequent Advance was not conditioned on a sale of the property.  A representative of the Juliano Parties inquired whether "CIBC [was] conditioning release of funds on putting the property up for sale," to which CIBC responded "they intend to comply with their obligations under the loan documents."  The Juliano Parties, however, argue that this was the "first time" they "removed the requirement conditioning its release of funding on the sale of the Grande Village Center."

Further, in the April 17, 2014 letters regarding Grande Properties and Willingboro from CIBC sent in response to the extension request, the letters reiterated that CIBC "delivered a term sheet that <u>proposed</u> an orderly sale process to be undertaken after build out of the Grande Village Property." (emphasis added).

Section 11 of Exhibit B provided for the "Lender's Right to Employ Consultant." It stated, in full: "Lender may employ a consultant (the 'Construction Consultant') to review all matters related to any Advance, and all costs incurred by Lender with respect to such Construction Consultant shall be paid by Borrower."

The Juliano Parties argue CIBC was permitted, under Section 11, "to hire a construction consultant in connection with each Advance to ensure that the construction previously funded was actually in place, but that "CIBC had no right under the July 2011 Modification, or any of the loan documents, to retain a construction consultant for purposes of approving the budget." CIBC argues that, since "an advance must be requested pursuant to a previously approved Budget," the approval of a budget is necessarily related to any Advance and "[t]herefore, the plain language of paragraph 11 grants CIBC the right to employ a consultant to review a Budget."

The Court views this issue as a dispute between the parties as to what is encompassed within the phrase "matters related to any Advance." "Whether a term is clear or ambiguous is . . . a question of law." Kaufman v. Provident Life & Casualty Ins. Co., 828 F. Supp. 275, 282 (D.N.J. 1992); accord Hendrickson v. E.P.C. Real Estate Equities, Inc., No. 09-3505, 1991 WL 117806, at *4 (D.N.J. May 24, 1991) ("In New Jersey, contract

interpretation is a question of law for the court.").  "An
ambiguity in a contract exists if the terms of the contract are
susceptible to at least two reasonable alternative
interpretations."  Id. at 283.

"The interpretation of a contract is ordinarily a legal
question for the court and may be decided on summary judgment
unless 'there is uncertainty, ambiguity or the need for parol
evidence in aid of interpretation . . . .'"  Celanese Ltd. v.
Essex Cty. Imp. Auth., 962 A.2d 591, 600 (N.J. Super. Ct. App.
Div. 2009) (quoting Great Atl. & Pac. Tea Co. v. Checchio, 762
A.2d 1057 (N.J. Super Ct. App. Div. 2000)).  "The interpretation
of the terms of a contract are decided by the court as a matter
of law unless the meaning is both unclear and dependent on
conflicting testimony."  Id. (quoting Bosshard v. Hackensack
Univ. Med. Ctr., 783 A.2d 731 (N.J. Super. Ct. App. Div. 2001)).
"The interpretation of ambiguous terms in a contract is
generally a question of fact."  Id.; accord Avaya Inc., RP v.
Telecom Labs., Inc., 838 F.3d 354, 378-79 (3d Cir. 2016)
("[U]nder New Jersey law, 'discerning contractual intent is a
question of fact unless the provisions of a contract are wholly
unambiguous.'" (quoting Jaasma v. Shell Oil Co., 412 F.3d 501,
507 (3d Cir. 2005))); In re Barclay Indus., Inc., 736 F.2d 75,
78 (3d Cir. 1984) ("[I]nterpretation of an ambiguous contract .
. . is a question of the parties' intent, and thus a question of

fact.").

"In interpreting a contract, a court must try to ascertain
the intention of the parties as revealed by the language used,
the situation of the parties, the attendant circumstances, and
the objects the parties were striving to attain." Id. "Thus,
in ruling on a summary judgment motion that involves the
interpretation of a contract, a court must necessarily determine
whether there is any genuine issue of material fact regarding
the parties' intentions." Id.

In the context of interpreting a forum selection clause,
the Eastern District of Pennsylvania recognized "that a clause
using the language 'related to' is extremely broad." Kahn v.
Am. Heritage Life Ins. Co., No. 06-1832, 2006 WL 1879192, at *6
(E.D. Pa. June 29, 2006); accord Collins & Aikman Prods. Co. v.
Building Sys., 58 F.3d 16, 20 (2d Cir. 1995) (stating that the
clause "any claim or controversy arising out of or relating to
the agreement" is "the paradigm of a broad clause," in
construing an arbitration agreement as broad or narrow).

"[T]he fact that a term is broad in scope does not
necessarily make it ambiguous." Coregis Ins. Co. v. Am. Health
Found., 241 F.3d 123, 129 (2d Cir. 2001). "Nor is a finding of
ambiguity appropriate, even assuming that a broad term might be
ambiguous with respect to its application to a hypothetical set
of facts, where . . . the plain meaning of the phrase

40

unambiguously includes the" situation at issue.  <u>Id.</u>

The Court, as a matter of law, does not find this contract provision ambiguous under these circumstances.  Exhibit B provides that, "[a]s a condition precedent to the disbursement of any funds . . . representing a portion of the Subsequent Advance," the Juliano Parties must furnish certain documents, among them "a Budget for the Capital Improvements, previously approved by Lender."  It is clear to this Court that the approval of a budget is a "matter[] related to any Advance."[18]

Accordingly, the Court finds a breach of contract claim cannot proceed on the basis of CIBC insisting on utilizing a construction consultant, as the Court finds Exhibit B expressly

---

[18]   This is consistent with prior interpretations of the phrase "related to."  Under Delaware law, courts give the phrase 'related to' its ordinary meaning, that is, 'connected in some way.'"  <u>AgroFresh Inc. v. MirTech, Inc.</u>, 257 F. Supp. 3d 643, 656-57 (D. Del. 2017) (quoting Black's Law Dictionary (10th ed. 2014)).

> The term "related to" has significance in other legal contexts such as employee benefits matters.  As used in the Employee Retirement Income Security Act, 29 U.S.C. § 100, et seq., courts have interpreted that a law "relates to" an employee benefit plan if it has a connection with or reference to such a plan.  The test for determining whether a civil proceeding is "related to" a bankruptcy case is whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.

<u>CBS Inc. v. Hasbro, Inc.</u>, No. 92-3611, 1994 WL 421365, at *20 (E.D. Pa. Aug. 9, 1994).

gives CIBC a right to so employ a construction consultant in

reviewing a proposed budget.[19]

### c. Requiring Deficiency Deposit

The "Deficiency Deposit" is explained in Section 13 of

Exhibit B.  It provides:

> If at any time, the projected cost of any individual
> Budget Line Item exceeds the amount set forth in the
> Budget for such individual Budget Line Item, as
> determined by Lender in its reasonable discretion, then
> Borrower shall, at Lender's request, deposit with Lender
> within five (5) days of such request cash in an amount
> sufficient to cover such deficiency (each such deposit
> being a "Deficiency Deposit").  Lender shall not be
> required to make any Advance before receiving payment of
> any such Deficiency Deposit and the prior application of
> any such Deficiency Deposit to the payment of the cost
> of the Approved Costs.

The parties' arguments regarding the deficiency deposit are

less than clear.  The Court discerns the following.  The Juliano

---

[19]    To the extent the Juliano Parties argue the use of a
Construction Consultant was unnecessary, as claimed in the
complaint, the Court finds the Juliano Parties' assessment of
the necessity of a Construction Consultant to be irrelevant.
Further, CIBC argues the Juliano Parties' interpretation of
this section would render Section 4(a)(v) superfluous.  Section
4(a)(v) provides that, as a condition precedent for advances for
payment of capital improvements, "Borrower shall furnish or
cause to be furnished to Lender, . . . if required by Lender, a
certification from an inspecting architect or other third party
acceptable to Lender, verifying that any work for which Borrower
is requesting and Advance has been properly completed and that
the cost of such work bears a reasonable relationship to the
Budget, and the costs incurred therefor."  The Court disagrees
with CIBC's interpretation of the interplay between Section 11
and Section 4(a)(v) and does not rely on Section 4(a)(v) in
determining the scope of Section 11.

Parties appear to argue that CIBC's failure to release the Subsequent Advance funds in November 2013 constituted a breach of contract because they conditioned disbursement on the funding of a Deficiency Deposit. According to the Juliano Parties, a Deficiency Deposit did not need to be made until CIBC's approval of a budget, which had yet to occur in November 2013.

The Court sees no evidentiary support for the argument that CIBC ever required a Deficiency Deposit prior to its January 21, 2014 budget approval. Rather, in CIBC's November 12, 2013 letter, CIBC stated:

> We further note that the "Project Total Cost" as set forth in your proposed budget exceeds the amount of the Subsequent Advance and the funds in the Leasing Reserve by not less than $214,184.60 (and far more if CIBC's records regarding the balance of the Leasing Reserve are accurate). <u>To the extent that the budget is approved</u> and expenses and incurred, CIBC shall require that the Borrower deposit an amount equal to the deficiency in a cash collateral account maintained at CIBC, which account shall be first used to pay any Capital Improvements and/or Approved Leasing Costs.

(emphasis added). This response to the initial request for the Subsequent Advance clearly shows CIBC's understanding that a Deficiency Deposit would be required after the approval of a budget.

Further, in the December 20, 2013 Summary Term Sheet, CIBC states: "[T]o the extent that the Budget exceeds the amount of available Subsequent Advances (<u>i.e.</u>, $1,981,207), the Borrower shall deposit with the Lender an amount equal to any such

shortfall . . . ."[20]

The Court sees no indication that CIBC ever conditioned

disbursement of the Subsequent Advance on funding a Deficiency

_____

[20]    While the Court could find no evidentiary support for the
allegation that CIBC conditioned disbursement of the Subsequent
Advance funds on the funding of a Deficiency Deposit prior to
the January 21, 2014 budget approval, the Court notes that in
CIBC's briefing, and in its Statement of Material Facts, it is
suggested that there might have been such a condition.  CIBC's
brief states:

> While CIBC was negotiating a potential workout in the
> context of its December 20 Draft Term Sheet, it continued
> to work on the entirely separate process of evaluating
> the Budget with its construction consultant, Property
> Solutions.  At that time, however, the Juliano Parties
> still had not funded (and never did fund) – let alone
> spend down – a Deficiency Deposit (negating any
> purported 'right' to reimbursement for costs already
> incurred).

The brief further states:

> [I]f the total costs in the budget exceed the amount of
> available Subsequent Advance Funds, CIBC has the
> discretion to first require the Borrower to fund a
> "Deficiency Deposit" in a cash account with CIBC and to
> exhaust the Deficiency Deposit before receiving any
> Subsequent Advance Funds.  It is the Juliano Parties'
> own failure to satisfy these express contractual
> conditions precedent that "slowed" CIBC's approval of
> the Budget.

(citations omitted).  CIBC's Statement of Material Facts states:
"Exhibit B requires Grande Village to 'balance' <u>any proposed or
approved</u> budget if, at any time the projected cost of any Budget
line item exceeds the amount set forth in the Budget for that
line item by depositing cash with CIBC in an amount sufficient
to cover the deficiency . . . ." (emphasis added).
    Statements made in CIBC's briefing, however, are not
evidence.  The Court thus does not rely on these statements in
making its determination.

Deposit prior to approving the budget. Rather, it appears clear to the Court that all parties considered the funding of the Deficiency Deposit to be an obligation required after approval of the budget but prior to disbursement of the Subsequent Advance. The Court similarly interprets the Deficiency Deposit provision to require the deposit of funds after the approval of a budget. Since the budget was not approved until January 21, 2014, after the Juliano Parties' last request for disbursement of the Subsequent Advance funds, the Court does not find a breach of contract claim can proceed on this basis.

### d. Refusal to Reimburse for Costs Incurred

The November 18, 2013 request for disbursement of the Subsequent Advance funds was insufficient to trigger disbursement because it was prior to CIBC's approval of a budget.

CIBC argues that "[f]ollowing CIBC's January 21, 2014 approval of the Budget, the Juliano Parties never requested the disbursement of any Subsequent Advance Funds." The Juliano Parties concede that following the January 21, 2014 budget approval, they "did not request disbursement of Subsequent Advance Funds" at it "was too late for Grande Village to timely construct the tenant improvements under the terms of the

Leases."

As there was no request for disbursement after January 21, 2014, and further no proof of expenses paid or funding of a Deficiency Deposit, the Court finds CIBC did not breach any of the agreements by not reimbursing the Juliano Parties for costs incurred.

## 2. Breach of the Implied Covenant of Good Faith and Fair Dealing

The various bases for the Juliano Parties' breach of the implied covenant of good faith and fair dealing claim are also less than clear as laid out before this Court. However, in its purview of the complaint in the 14-3495 matter, the Court's March 6, 2015 Opinion, and the briefing before the Court, the Court can discern four separate bases for this claim: (1) CIBC's declarations of default, (2) CIBC's proposed sale of the Grande Village property, (3) CIBC's delay in disbursing the Subsequent Advance, and (4) the transfer of the loans from REF to Special Loans.

"Under New Jersey law, all contracts include an implied covenant that the parties to the contract will act in good faith." Pereira v. Azevedo, No. 12-907, 2013 WL 1655988, at *8 (D.N.J. Apr. 17, 2013). "This obligation to perform contracts in good faith has been interpreted in New Jersey to mean that 'neither party shall do anything which will have the effect of

destroying or injuring the right of the other party to receive the fruits of the contract.'" <u>Emerson Radio Corp. v. Orion Sales, Inc.</u>, 253 F.3d 159, 170 (3d Cir. 2001) (quoting <u>Sons of Thunder, Inc. v. Borden, Inc.</u>, 690 A.2d 575, 587 (N.J. 1997)).

"Proof of 'bad motive or intention' is vital to an action for breach of the covenant." <u>Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.</u>, 864 A.2d 387, 396 (N.J. 2005). "An allegation of bad faith or unfair dealing should not be permitted to be advanced in the abstract and absent improper motive." <u>Wilson v. Amerada Hess Corp.</u>, 773 A.2d 1121, 1130 (N.J. 2001). "Without bad motive or intention, discretionary decisions that happen to result in economic disadvantage to the other party are of no legal significance." <u>Id.</u>

> [A] party exercising its right to use discretion . . . under a contract breaches the duty of good faith and fair dealing if that party exercises its discretionary authority arbitrarily, unreasonably, or capriciously, with the objective of preventing the other party from receiving its reasonably expected fruits under the contract. Such risks clearly would be beyond the expectations of the parties at the formation of a contract when parties reasonably intend their business relationship to be mutually beneficial. They do not reasonably intend that one party would use the powers bestowed on it to destroy unilaterally the other's expectations without legitimate purpose.

<u>Id.</u>

For the reasons that follow, the Court finds Plaintiffs' claim of a breach of the implied covenant of good faith and fair dealing must proceed to trial, as questions of fact remain.

### a. Declaring Defaults

In the Court's March 6, 2015 Opinion, the Court allowed the breach of the implied covenant of good faith and fair dealing claim to proceed on the basis of the Juliano Parties' allegation that CIBC wrongfully declared them to be in default.[21]

CIBC sent three Default Notices to the Juliano Parties on March 3, 2014. The Willingboro Default Notice and Grande Properties Default Notice both stated, in pertinent part:

> Please be advised that the Lender has not received (i) ECF Statements with respect to the months ended October 2013, November 2013 and December 2013, (ii) Annual Financial Statements for the year ended 2012, (iii) Guarantor Annual Financial Statements from William T. Juliano for the year ended 2012, (iv) Quarterly Financial Covenant Certifications for the quarters ended March 2013, June 2013 or September 2013, (v) Annual Financial Covenant Certifications for the year ended 2012, (vi) the Operating Budget for 2014, (vii) complete Monthly Reporting packages for January 2014 and throughout 2013. As a result, certain Defaults have occurred under the Loan Agreement and related Loan Documents. This letter is intended to serve as written notice of such Defaults.

The Grande Village Default Notice stated, in pertinent part:

> Please be advised that the Lender has not received (i)

---

[21] In the Court's March 6, 2015 Opinion, the Court determined that an allegedly improper declaration of default did not, on the pleadings in the Juliano Parties' complaint, amount to a breach of contract claim, as the Juliano Parties did not identify the specific contractual provisions allegedly breached. However, the Court recognized that "an improper declaration of default may excuse plaintiffs' contractual obligations, or may invoke New Jersey's implied covenant of good faith and fair dealing."

ECF Statements with respect to the months ended October
2013, November 2013 and December 2013, (ii) Quarterly
Operating Statements with respect to the quarter ended
September 2013, (iii) a certified Annual Rent Roll as of
January 1, 2013 or (iv) certified financial statements
from William T. Juliano for the year ended 2012.  As a
result,  certain  Defaults  have  occurred  under  the
Mortgage and related Loan Documents.  This letter is
intended to serve as written notice of such Defaults.

The Court finds a question of fact exists as to whether
these declarations of default were justified such that the
implied covenant of good faith and fair dealing was not
breached.   In their Responsive Statement of Material Facts, the
Juliano Parties contend "operating statements and EFC
certifications were in fact provided in the same manner that the
Juliano Parties had done since the Loan Modification was
executed in 2011."  They also state "William Juliano's personal
financial statement for the year ended December 31, 2012" was
provided "on or about February 27, 2013."  They also argue they
provided monthly reporting, which included covenant reporting
for March 2013, June 2013, and September 2013.  They assert ECF
statements for October 2013, November 2013, and December 2013
were provided on February 24, 2014.  The parties appear to
contest both what was actually submitted as well as whether what
was indeed submitted was in an acceptable form under the loan
documents.

The Court finds a material question of fact exists as to
whether all of the requisite information was provided and

whether it was provided in an acceptable form.[22]  This claim will
proceed to trial.

### b. Subsequent Advance Conditioned on Sale of the Property

Second, in the Court's March 6, 2015 Opinion, the Court
allowed the implied covenant of good faith and fair dealing
claim to proceed on the basis of the Juliano Parties' allegation
that CIBC exercised its discretion, in bad faith, to require the
sale of the Grande Village property before releasing the

---

[22]    To the extent the Juliano Parties argue any previous
leniency granted in fulfilling reporting requirements resulted
in a waiver of those requirements, the Court rejects that
argument.

> [A] creditor's temporary forbearance in exercising its
> remedies upon its debtor's default does not preclude the
> creditor from subsequently exercising those rights.
> "Indeed, a contrary view would discourage lenders from
> allowing borrowers leeway and encourage those lenders to
> play hardball in the face of every default, no matter
> how minor."

Glenfed Fin. Corp., Commercial Finance Div. v. Penick Corp. 647
A.2d 852, 859 (N.J. Super. Ct. App. Div. 1994) (quoting Fasolino
Foods Co. v. Banca Nazionale Del Lavoro, 961 F.2d 1052, 1057 (2d
Cir. 1992)).

Further, the Grande Village Loan Agreement stated:

> Lender may waive any single Event of Default by Borrower
> hereunder without waiving any other prior or subsequent
> Event of Default. . . .  Neither the failure by Lender
> to exercise, nor the delay by Lender in exercising any
> right, power or remedy upon any Event of Default by
> Borrower hereunder shall be construed as a waiver of
> such event of Default or as a waiver of the right to
> exercise any such right, power or remedy at a later date.

Subsequent Advance.  As explained earlier in this Opinion, the Court finds the references to a sale of the property were proposals for a modification to the loan documents only.  The Court can find no evidentiary support for the allegation that the Subsequent Advance was conditioned on the sale of the property.  The Court is convinced this was proposed in connection with the negotiations for a work out of the loan agreements.

To the extent the Juliano Parties' claim is construed as alleging bad faith in the negotiation process to modify the loans, that argument must fail.  "A party cannot act in bad faith to destroy or injure the other party's right to receive the fruits of the contract."  Hernandez v. M&T Bank, No. 15-470, 2016 WL 816746, at *3 (D.N.J. Feb. 25, 2016).  "A lender does not, however, defeat the other party's contractual rights by declining to renegotiate the contract.  In doing so, it is merely exercising its own rights under the contract."  Id. (citing Woods Corp. Assocs. v. Signet Star Holdings, Inc., 910 F. Supp. 1019, 1034 (D.N.J. 1995)); accord Nat'l Westminster Bank NJ v. Lomker, 649 A.2d 1328, 1331 (N.J. Super. Ct. App. Div. 1994) ("In the context of commercial loans, we have recently recognized that this good faith requirement does not impose upon a lender obligations that alter the terms of its deal or preclude it from exercising its bargained-for rights.").

"A creditor's duty to act in good faith does not encompass 'compromising its contractual rights in order to aid its debtor.'" Hernandez, 2016 WL 816746, at *3 (quoting Glenfed Fin. Corp. v. Penick Corp., 647 A.2d 852, 857 (N.J. Super. Ct. App. Div. 1994)).[23]

The proposal to sell the Grande Village property was made in connection with negotiations to modify the loan documents. Thus, this fails as a basis for the Juliano Parties' breach of the implied covenant of good faith and fair dealing claim.

### c. Delay in Granting the Subsequent Advance

Third, the Juliano Parties' briefing describes the "crux" of their breach of the implied covenant of good faith and fair dealing claim to be "that CIBC arbitrarily, capriciously, and unreasonably refused and delayed to grant the Subsequent Advance . . . until it was too late for the Juliano Parties to make any use of the Subsequent Advance." The Court finds there to be a

---

[23] In Hernandez, the court granted a motion to dismiss a claim for breach of the implied covenant of good faith and fair dealing based on an alleged failure to "timely respond to [a] request for a loan modification." 2016 WL 816746, at *3; see also Woods Corp. Assocs., 910 F. Supp. at 1034 (stating that, "[b]y refusing to execute an agreement to renegotiate the loan," the party "did nothing more than exercise its contractual rights to protect its interest in the security" and that the party "had no obligation to agree to a loan modification, and its failure to do so cannot be said to be 'bad faith.'"). The Court finds an allegedly unreasonable term provided in connection with a proposed modification, even if made in bad faith, cannot be construed as a breach of the implied covenant of good faith and fair dealing.

question of fact on this issue.

The Juliano Parties argue many mechanisms were utilized to delay the process of approving the budget and ultimately disbursing the Subsequent Advance funds. They argue the "construction consultant ruse" was used "to delay approving the budget until it was too late for the Juliano Parties to timely construct the tenant improvements required under the West Marine and [S]tate Leases . . . ." Although the use of a Construction Consultant did not constitute a breach of contract, to the extent one was used in bad faith to contribute to a delay, that claim may proceed to trial. Further, while the Court finds the proposal to sell the Grande Village claim would not provide a basis for the breach of contract claim or, in and of itself, for a breach of the covenant of good faith and fair dealing claim, the Court finds that, to the extent the Juliano Parties argue the negotiations and proposal to sell the property were used to cause a delay, that argument may proceed to trial.

Finally, the Juliano Parties argue CIBC engaged in a "sham and tortured construction budget review process" as the basis for both their breach of the covenant of good faith and fair dealing claim and their tortious interference with contract claim, addressed below. Exhibit B elaborates on the required budget as follows: "The budget shall include line items . . . for the cost of all labor, materials and equipment to be used in

constructing and completing the Capital Improvements . . . ."

The Juliano Parties allege CIBC had been provided a budget for the State Lease fit out as early as June 2012. The Juliano Parties argue Schedule B to the State Lease specified in detail the necessary tenant fit out work. CIBC argues, however, that the draft of the State Lease that CIBC received in June 2012 "provided no specific construction design plans." And that CIBC could not "review the reasonableness or feasibility of any proposed construction activities or prospective budget . . . based upon the contents of this entirely preliminary document." CIBC argues the alleged June 2012 budget "lacked the necessary Budget Line Items and failed to satisfy the other requirements of an actual 'Budget.'"

In March 2013, CIBC was provided with a "Budget Proposal Letter" with regard to the West Marine and State tenant fit outs. While the Juliano Parties refer to this as a "budget" in their Supplemental Statement of Material Disputed Facts, CIBC "disputes any implication or allegation that this document constituted a 'Budget' as defined in Exhibit B." Specifically, CIBC argues the March 2013 budget also "lacked the necessary Budget Line Items" required by Exhibit B.

The Juliano Parties allege CIBC was provided with a copy of the West Marine Lease as early as April 2013, and that Exhibit F to the West Marine Lease specified in detail the necessary

tenant fit out work. CIBC "disputes that it received a copy of a West Marine Lease which provided the detailed construction plans necessary to complete the Build-Out or which provided CIBC with information sufficient to review and approve a Budget for the Build-Out."

With regard to the Juliano Parties' May 7, 2013 proposal which initiated negotiations, the Juliano Parties refer to this as a "budget." However, CIBC disputes that the proposal: "(i) contained a 'Budget' as defined in Exhibit B to the Grande Village Mortgage, (ii) provided information sufficient to review and approve such a Budget, or (iii) constituted a valid request for a disbursement of Subsequent Advance Funds pursuant to Exhibit B to the Grande Village Mortgage." The Juliano Parties further argue this May 7, 2013 "budget" was "approved, at least tentatively," by CIBC, citing the May 13, 2013 Memorandum. In CIBC's May 13, 2013 Memorandum, CIBC stated: "We believe that the proposed State of New Jersey and West Marine tenants are accretive in value to the property and we support your efforts to finalize their leases." CIBC disputes both that they approved the leases on that date and "any implication . . . that the approval of the Leases constituted approval of, or commitment to approve, a future 'Budget' pursuant to Exhibit B to the Grande Village Mortgage."

CIBC argues it first received a proposed budget in November

2013.  By way of a November 8, 2013 letter, the Juliano Parties

enclosed a proposed budget, stating:

> Pursuant to Exhibit 'B,' enclosed is a Budget showing
> the Approved Costs.  As you can see, the total budgeted
> costs are $2,488,220.00, $2,274,035.40 of which will be
> funded from the Subsequent Advance and the Leasing
> Reserve, and the balance of which will be funded from
> Borrower's own funds.  Borrower hereby requests that
> Lender approve the enclosed Budget.

CIBC's explanation for the delay in approving the budget

from that point forward is as follows.  As of November 2013,

CIBC had not received a Construction Consultant's review for a

proposed budget or necessary documentation for such a review.

On December 6, 2013, CIBC notified the Juliano Parties as

follows:

> David Slade[24] of CIBC has been working diligently with
> the Borrower to obtain and review necessary additional
> information and supporting detail with regard to the
> items identified in the proposed Budget.  Unfortunately,
> at this time CIBC has not had a reasonable opportunity
> to review all supplemental information needed to
> reasonably analyze the proposed Budget.  Accordingly,
> this letter serves as notice to the Borrower that CIBC
> does not approve the proposed Budget.

CIBC argues that, as of December 10, 2013, the Juliano Parties

still had not provided the necessary information for final

approval of the proposed budget.  In a December 10, 2013 e-mail

from Slade to Charles Mulkeen, an employee of CIBC, Slade

stated:

---

[24]   David Slade is a construction lending specialist at CIBC.

I provided a checklist to Tom Juliano and I have received most of the key items required. There are some additional items that still need to be submitted, but based on what has been received to date, we are far along and comfortable with the proposed construction.[25] Construction lending/review is a process, and it typically does not all come together until we get to closing. This is a little different in that the loan has closed and we are being requested to disburse a holdback. With that, however, things are progressing well but there are a few notable items. These include:

1. Based on the budget analysis, the borrower needs to put in an additional $500,000 to cover the costs . . . . I have communicated this to the borrower but I have not yet received a response;

2. I am told that the permits are available but have not yet been picked up. The borrower states that he does not want to incur the cost until he is good to go with the construction. This is not that unusual but we will need to receive and review the permits prior to giving the final green light;

3. The borrower has not yet given us the authorization to engage the consultant, but we are in a position to do so when the borrower responds;

4. Once the borrower authorizes us to engage the consultant, the consultant will need

_____

[25]    The Juliano Parties seem to imply in their brief that this is an admission that Slade did not require any additional information to review the budget. See Juliano Br. 38 ("Moreover, while the Juliano Parties disagree that Mr. Slade needed any additional information to review the budget, on December 10th, -- _i.e., 42 days prior to CIBC finally approving the budget_ – Slade himself stated in an email to Mulkeen that 'based upon what has been received to date, we are far along and comfortable with the proposed construction.'"). However, Slade goes on to list a number of "notable items" still not provided. The Juliano Parties argue similarly with regard to the December 6, 2013 e-mail.

about two weeks to perform the review. We
will need the review and then, if necessary,
have the borrower respond to any open items
and/or items of concern. This is not all
that unusual and typically does not require
much time;

5. Although I believe that perhaps Bill
Juliano mentioned that he has begun steel
fabrication, I have found that at best they
have authorized the drawing required to
fabricate;

6. Equity to date is listed at $356,029.95,
but we have not yet seen the back-up (this
does not offset the $500,000 mentioned
above; it is in addition to);

7. We are awaiting a response from the borrower
to determine if any leasing commissions are
still outstanding.

These questions and outstanding items are not all that
unusual, but they will need to be answered and delivered
prior to approving the construction.

On January 13, 2014, the Construction Consultant e-mailed

Slade with regard to the budget and advised that they should

"have the report completed by the end of the week." In that e-

mail, the Construction Consultant identified the following

outstanding items:

1. Executed construction contract

2. Building permits

3. Overall project development (including amount of
contingency for hard cost increases due to change
orders)

4. Architect agreement

Property Solutions' review was dated complete as of January 13,

2014, which identified some continuing deficiencies.  The review

was received by CIBC on January 20, 2014.  CIBC approved the

Budget on January 21, 2014.[26]

The Juliano Parties "malice" argument under its tortious

interference claim supports their allegation of "bad faith."  As

this Court will be dismissing that claim as duplicative, the

Court addresses that argument here.  They argue "CIBC's malice

is palpable – it knew that Grande Village risked losing the

Leases as a result of its delay in approving the final budget

(since it could not meet the deadline for the tenant

improvements under the Leases), yet it continued its

unreasonable delay anyway."  The Juliano Parties informed CIBC

of the need for a quick approval of the budget several times.[27]

---

[26]    As part of their "sham" budget approval argument, the
Juliano Parties argue that "despite having been provided with a
preliminary budget by June 2012, and a developed budget in March
2013, CIBC advised the Juliano Parties for the very first time
on November 19, 2013, of David Slade's involvement, and that he
would need more information before the budget could be
approved."  They also point out that "Mulkeen did not even get
Slade 'involved in the construction requirements' until after
CIBC had received counsel's letter on November 8th."

[27]    On November 18, 2013, the Juliano Parties stated: "[W]e
look forward to hearing from CIBC so that we can proceed with
the work required under leases that CIBC has already approved.
Our client will incur significant losses if it is unable to
deliver the spaces when required under the approved leases."
Again, on December 5, 2013, William Juliano requested CIBC "not
hold up the construction as we have strict time limits to
complete in accordance with the leases."  Further, on January
15, 2014 the Juliano Parties asked for an update on the budget

With reference to their tortious interference claim, the parties make several arguments as to damages being caused by CIBC's actions. The Court also addresses the damages argument here.[28]

CIBC argues both the State and West Marine were "prepared to accept delivery of their respective leased spaces for <u>more than one year</u> after CIBC approved the Budget on January 21, 2014. Thus, CIBC's purported 'delay' in approving the Budget did not cause any loss to Grande Village." CIBC argues the Juliano Parties knew that the State of New Jersey and West Marine were willing to accept a modified delivery date under their respective leases.

The State terminated its lease by way of a March 4, 2015 letter, which referenced an earlier February 9, 2015 letter providing the Juliano Parties an opportunity to take "immediate corrective action" to avoid the State terminating its lease. Prior to this point from April 2014 onward, the State had been in contact asking for updates on the construction and had indicated a willingness to accept a later delivery. As for West Marine, it terminated its lease by way of a March 11, 2015 letter, which stated that West Marine "asked for assurance of

_____

approval, stating that "the delays are further threatening the project."

[28] The Court incorporates these same findings as to bad faith and damages in the other bases for a breach of the implied covenant of good faith and fair dealing.

delivery over a year ago and to date has not received any such assurance."

The parties also argue the relevancy of the Juliano Parties not yet having obtained all necessary zoning approvals and permits.  The Court reserves these factual issues for trial.

### d. Transfer to Special Loans

Fourth, the Juliano Parties' briefing further argues CIBC engaged in this delay "because the Special Loans Group determined to exit the Loans without funding the tenant fit out construction and without extending the maturity date."[29]

It is undisputed that, from the date of inception through July 2013, the loans were managed by REF.  It is also undisputed that, on July 29, 2013, CIBC transferred the loans from REF to Special Loans.  It is further undisputed that the loans were current on payments owed to CIBC when they were transferred to Special Loans.  The reason for this transfer from REF to Special Loans, however, is disputed.

According to the Juliano Parties, "[t]he Loans were transferred to Special Loans exclusively because of improper accounting employed by CIBC in connection with the Deferred Interest Provision that CIBC implemented in the July 2011

---

[29]    The Court has reviewed the Juliano's Complaint in the 14–3495 matter, and there is no mention of the transfer to Special Loans as a basis for the breach of fiduciary duty claim.

Modificiation."  They argue that the 2011 July Modification constituted a Troubled Debt Restructuring (TDR), which CIBC "fail[ed] to acknowledge."[30]  According to the Juliano Parties, a TDR designation means a loan has been impaired, and, where a loan is impaired, the recognition of interest income should be discontinued.  The Juliano Parties argue CIBC's accounting treatment was improper as CIBC "treat[ed] as current income both the interest that was actually being paid by the Borrowers and the deferred interest not being paid currently by the Borrowers as well."

The Juliano Parties allege "[f]ederal bank regulators examined CIBC in 2013 and determined that CIBC's accounting treatment of the deferred interest as income was improper," which "forced CIBC to reverse its treatment of same."  They claim that, "[w]hen CIBC reversed its practice and no longer treated the accrued interest as income, it automatically downgraded the risk rating of the Loans, which resulted in the Loans being transferred to Special Loans."  The Juliano Parties

---

[30]    According to the Juliano Parties, there are two conditions to be considered a TDR:

(1) the debtor is experiencing financial difficulties which put in doubt the debtor's continuing ability to repay the loan in accordance with its terms; and (2) the creditor/lender must give the debtor a non-market concession, i.e., an accommodation or change in the loan terms and/or conditions that a lender would not make to a credit worthy borrower at the inception of a loan.

argue that, "[u]pon being transferred to Special Loans, CIBC's objective was exiting the Loans from the Bank" and not to rehabilitate the loans to allow them to remain with CIBC.

CIBC argues the loans were transferred to Special Loans "based principally on their consistently declining internal risk ratings." They state:

> Prior to that point, the risk ratings had declined steadily for many years and, immediately before the transfer to Special Loans, a further downgrade of the Loans occurred in response to a write-off of previously accrued deferred interest, per the July 2011 Modification, in accordance with regulatory guidance from the Board of Governors of the Federal Reserve System.

They argue

> [t]he Loans substandard risk rating at the time of the transfer to Special Loans reflected, among other things, the Properties' failure to achieve the levels of financial operating performance necessary to reach stabilization at maturity, a concern about repayment at maturity, and CIBC's contemporaneous determination to write off, pursuant to regulatory guidance, certain deferred interest previously accrued as income on the Loans.[31]

In terms of the treatment of the loans once transferred to

---

[31] CIBC concedes that "a revision to its accounting treatment for deferred interest on the Loans resulted in a further downgrade to the risk ratings for the Loans – and that such downgrade was the proverbial 'straw that broke the camel's back' in the context of numerous risk rating downgrades in the course of administering the Loans," but "disputes any implication or allegation that the Loans were transferred to Special Loans solely because of a change in internal accounting practices."
Further, CIBC argues the Juliano Parties did not have "any right under the Loan Documents to require that the Loans be administered by a specific group within CIBC."

Special Loans, CIBC argues it was always the intention, whether in REF or Special Loans, to "exit" the loans within a few years, whether through refinancing with the Juliano Parties or a sale of the properties. This is confirmed in a "Deals Committee" Report, generated on January 28, 2011 (prior to the July 2013 transfer from REF to Special Loans) defining the "Exit Strategy" as "[t]hese loans are expected to be repaid from property sale or refinance in the future with additional seasoning." A recommendation contained in that report further confirmed that the goal was to "improve prospects for exit through sale or refinance." Thus, the "orderly exit" of the loans was an expectation that originated with REF and continued after the transfer from Special Loans.

Mulkeen testified in his December 16, 2015 deposition that, upon transfer to Special Loans, the objective was "to get the best recovery possible on behalf of the bank," which in this case would be to collect as much as possible on the credit, whether that be accomplished quickly or through waiting. Douglas Brown, who is in charge of the Special Loans group, testified at his November 16, 2015 deposition that "[w]hen an account is transferred to [Special Loans], [they] do a diagnostic and [they] determine the range of options to manage the account, and that can span through rehabilitation, it can be an exit through a refi for other means, and ultimately if

there's no other consensual exit, through a liquidation." Brown stated that, "[a]t the time [Special Loans] got the account, the view internally was that we wanted to find an orderly exit."

The Court finds a question of fact exists here as to whether CIBC transferred the loans to Special Loans in bad faith with the intention of "destroying or injuring the rights of the other party to receive the fruits of the contract." See Emerson Radio Corp., 253 F.3d at 170 (quoting Sons of Thunder, 690 A.2d at 587).[32]

Accordingly, the breach of the implied covenant of good faith and fair dealing claim may proceed to trial on the following bases: (1) breach for declaring improper defaults; (2) breach for conditioning the Subsequent Advance on the sale of the Grande Village property; (3) breach for delaying the process of obtaining the Subsequent Advance funds; and (4) breach for

---

[32] In its moving brief, CIBC argues it "did not abuse its discretion by declining to accept an unwarranted discounted payoff of the Loans or to prematurely extend the Grande Village Loan." However, the Juliano Parties state in their opposition brief that they "do not base their claim upon CIBC's refusal to discount a pay-off of the Loans" and that they "do not base their claim on any . . . refusal in 2013 [to extend the Grande Village Loan]." The Juliano Parties do argue, "however, that CIBC's pretextual denial of the Juliano's exercise in April 2014 of their right to extend the maturity date was a further breach of the Loan Agreements and is compelling evidence of CIBC's bad faith conduct after the Loans were transferred to the Special Loans Group."

transfer to and treatment of the loans by Special Loans.[33]

---

[33]    CIBC argues "the Juliano Parties never provided notice to
CIBC, as required by the Loan Documents, of any purported breach
by CIBC, thereby waiving any conceivable right to claim that
their future performance was excused by such recently contrived
'prior breaches.'"  For this proposition, CIBC cites a provision
in the Willingboro Loan Agreement and in the Grande Properties
Loan Agreement.  The Willingboro Loan Agreement provided:

>    Lender shall not be in default under this Agreement, or
>    under any other Loan Documents, unless a written notice
>    specifically setting forth the claim of Borrower shall
>    have been given to Lender within thirty (30) days after
>    Borrower first had knowledge of, the occurrence of the
>    event which Borrower alleges gave rise to such claim and
>    Lender does not remedy or cure the default, if any there
>    be, promptly thereafter.  Borrower waives any claim,
>    set-off or defense against Lender arising by reason of
>    any such alleged default as to which Borrower does not
>    give such notice timely as aforesaid.  Borrower
>    acknowledges that such waiver is or may be essential to
>    Lender's ability to enforce its remedies without delay
>    and that such waiver therefore constitutes a substantial
>    part of the bargain between Lender and Borrower with
>    regard to the Loan.  If it is determined in any
>    proceedings that Lender has improperly failed to grant
>    its consent or approval, where such consent or approval
>    is required by this Agreement or any other Loan
>    Documents, Borrower's sole remedies shall be an action
>    for specific performance or injunctive relief, or to
>    obtain declaratory relief determining such withholding
>    to have been improper, and Borrower hereby waives all
>    other claims for damages and all claims for set-off
>    against Lender resulting from any such withholding of
>    consent or approval, except Borrower shall not be
>    required to waive any claims if the Lender has acted or
>    failed to act in bad faith.

The Grande Properties loan agreement provides similarly.
The Court notes the last sentence ends with "Borrower shall
not be required to waive any claims if the Lender has acted or
failed to act in bad faith."  Accordingly, the Court finds any
lack of notice inconsequential, as only the breach of the
implied covenant of good faith and fair dealing claims will be
moving forward.

### 3. Tortious interference

The general rule defining the elements of tortious interference with an existing contract is: "One who intentionally interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract."

Nostrame v. Santiago, 61 A.3d 893, 901 (N.J. 2013) (quoting

Restatement (Second) of Torts § 766).  As an elemental test, it

requires: "(1) actual interference with a contract; (2) that the

interference was inflicted intentionally by a defendant who is

not a party to the contract; (3) that the interference was

without justification; and (4) that the interference caused

damage."  Russo v. Nagel, 817 A.2d 426, 434 (N.J. Super. Ct.

App. Div. 2003); accord Fidelity Eatontown, LLC v. Excellency

Enter., LLC, No. 16-3899, 2017 WL 2691417, at *7 (D.N.J. June

22, 2017) ("[A] plaintiff must prove: (1) an existing

contractual relationship; (2) intentional and malicious

interference with that relationship; (3) loss or breach of a

contract as a result of the interference; and (4) damages

resulting from that interference." (citing DiGiorgio Corp. v.

Mendez & Co., Inc., 230 F. Supp. 2d 552, 558 (D.N.J. 2002))).

The Juliano Parties argue CIBC engaged in a "sham and

tortured construction budget review process" as the basis for

their tortious interference claim.  They argue CIBC tortuously

"interfered with Grande Village's ability to perform under the Leases by wrongfully denying and delaying final Budget approval and funding the Subsequent Advance, resulting in its inability to timely complete the tenant improvements required under the Leases."

The Juliano Parties' tortious interference claim will be dismissed. The Juliano Parties' arguments and the evidence relied on in support of their tortious interference claim are the same as the basis of their breach of the implied covenant of good faith and fair dealing claim. As pled and argued, the tortious interference claim is essentially one for breach of contract. See, e.g., S&Y5, Inc. v. Sang Eun Lee, No. 14-5911, 2016 WL 8674604, at *3 (D.N.J. Dec. 2, 2016).

> The preference for adjudicating such issues by principles of contract law . . . cannot be ignored . . . . We discern, even from the attenuated record before us in this summary judgment appeal, that the interference with contractual relations claim has no viability independent of the breach of contract claims because everything defendants are alleged to have done by way of contractual interference corresponds directly with their contractual duties to plaintiffs.

Centr. Paper Distribution Servs. v. Int'l Records Storage & Retrieval Serv., Inc., 738 A.2d 962, 968 (N.J. Super. Ct. App. Div. 1999). While "the cause of action for 'tortious interference' may have separate qualities if there are proofs that defendants acted in ways which would not constitute a breach of contract and served unreasonably to deprive plaintiffs

of economic benefits they had a right to expect," id., the Court does not find such "separate qualities" to be present in this case.

> Where a plaintiff has a viable breach of contract claim which is based on proofs congruent with those available to establish tortious interference, there is no need to stretch the law to fit special circumstances in a redundant effort to accomplish substantial justice, especially in a jurisdiction [applying New Jersey law,] where the implied covenant of good faith and fair dealing is so firmly implanted.

Id. at 967.  Accordingly, the Juliano Parties' tortious interference claim will be dismissed.

### 4. Declaratory Judgment

The Juliano Parties also argue they "are entitled to a judicial declaration that CIBC materially breached the Loan Documents," that "plaintiffs are not in default of the Loan Documents," and "that maturity date of the Loans is May 10, 2015, as extended by the Borrowers on April 9, 2014."[34]

N.J.S.A. 2A:16-52 provides: "All courts of record in this state shall, within their respective jurisdictions, have power to declare rights, status and other legal relations, whether or not further relief is or could be claimed; and no action or

---

[34]    Alternatively, the Juliano Parties argue they "are entitled to a judicial declaration that the purported technical defaults declared by CIBC on March 3, 2014 and April 17, 2014 are null and void as a result of CIBC's pre-occurring material breaches of the Loan Documents and its duty of good faith and fair dealing."

proceeding shall be open to objection on the ground that a
declaratory judgment is demanded." "The purposes of a
declaratory judgment is 'to end uncertainty about the legal
rights and duties of the parties to litigation . . . ."
Mercedes-Benz USA, LLC v. ATX Grp., Inc., No. 08-3529, 2010 WL
3283544, at *9 (D.N.J. Aug. 18, 2010) (quoting N.J. Ass'n for
Retarded Citizens, Inc. v. N.J. Dep't of Human Serv., 445 A.2d
704 (1982)). "A declaratory judgment action should lie 'only in
cases where it could be of some practical convenience to the
parties.'" Id. (quoting Larson v. Gen. Motors Corp., 134 F.2d
450, 453 (2d Cir. 1943)).

As the Court finds the maturity date of the Loans was May
10, 2014, not May 10, 2015, as discussed below, the Court will
grant summary judgment for CIBC on that basis. The rest of the
grounds for declaratory judgment will proceed to trial.

**B. The 14-5047 Claims by CIBC Against the Juliano Parties**

The October 2, 2014 Second Amended Complaint in the 14-5047
action brings six counts by CIBC against the Juliano Parties.
Principally, CIBC argues the Juliano Parties breached the loan
agreements by failing to pay the amounts due under the loans on
their final maturity date. They further argue William Juliano
and Thomas Juliano breached their guarantees under the loan
documents. The other four counts of the complaint –
foreclosure, security interest foreclosure, possession, and rent

70

receiver – plead for relief stemming from these primary alleged breaches.

CIBC argues it is entitled to summary judgment on its 14-5047 claims and to repayment in the amount of $55,182,901.39.[35]

### 1. Breach of the Loan Agreements

CIBC argues the Juliano Parties failed to make any payments on the loans after they matured on May 10, 2014. There are two predominant issues the Court must resolve in determining whether CIBC is entitled to summary judgment on this claim: (1) whether CIBC permissibly denied the Juliano Parties' attempt to extend the maturity date of the loans to May 10, 2015[36] and (2) if so, whether the Juliano Parties were excused from making payments due to a material breach under the loan documents by CIBC.

---

[35] CIBC states that "[t]his amount represents the sum total of all principal, interest, default interest, penalty interest, and sundry fees and expenses owed by the Borrowers, as of May 2, 2016." CIBC cites its Statement of Material Facts in producing this figure in its brief. However, the Statement of Material Facts states that "the aggregate amount of principal, interest and other fees due and owing under the Loans . . . is $54,178,620.38," with $7,599,503.59 owing from the Willingboro loan, $38,531,954.55 owing from the Grande Properties loan, and $8,047,162.24 owing from the Grande Village loan. It is not clear to this Court why the aggregate figure provided in the Statement of Material Facts is not equivalent with the figure provided in CIBC's brief.

[36] The Court notes that the final possible maturity date, May 10, 2016, has long since passed. Nonetheless, resolving this issue is necessary in determining whether an impermissible refusal to extend the maturity date could be a grounds for the Juliano Parties' failure to pay.

### a. Extension of the Maturity Date to May 10, 2015

All three of the loan modification agreements provided for an option to extend the maturity date for the loans.  There were three extension options allowed: first, from May 10, 2013 to May 10, 2014; second, from May 10, 2014 to May 10, 2015; and third, from May 10, 2015 to May 10, 2016.  The extension from May 10, 2013 to May 10, 2014 had already been exercised and is not an issue of contention in these matters.  The extension option in dispute is the second option to extend the maturity date from May 10, 2014 to May 10, 2015.

All three loan modification agreements required that the property "has achieved and maintained a Debt Service Coverage Ratio" of "equal to or greater than 1.00:1.0" for the twelve-month period ending March 31 for the second extension term." The Willingboro loan modification agreement further required "a Net Operating Income of greater than or equal to $414,000.00." The Grande Village Loan Modification Agreement further required "a Net Operating Income of greater than or equal to $432,000.00."  The loan modification agreements all further required delivery "of all items reasonably required . . . in connection with [the] evaluation of Borrower's request to exercise the Extension, all of which must be reasonably acceptable in form and substance to [Lender], including, without limitation, current operating statements, rent rolls (if

applicable) and financial statements." The documents also provide: "[N]o Event of Default shall have occurred and be continuing either at the time of the delivery of the Extension Notice with respect to the Extension or on the date of the commencement of the Extension Term."

By way of April 9, 2014 letters, the Juliano Parties attempted to exercise their option to extend the maturity date of the loans for the second extension term from May 10, 2014 to May 10, 2015. CIBC maintains that "none of the April 9, 2014 letters provided the February and March 2014 income statements necessary to determine whether the Borrowers satisfied their respective debt service coverage ratio and net operating income requirements for the trailing twelve-month period running from April 1, 2013 through March 31, 2014." CIBC argues that, without the February 2014 and March 2014 monthly income statements, the Juliano Parties "could not, and did not, demonstrate that they satisfied their respective NOI and DSCR requirements to extend the maturity date of the Loans beyond May 10, 2014." CIBC also argues an extension was not warranted because "the Juliano Parties failed to respond to outstanding default notices despite being required to do so pursuant to the Loan Documents."

The Juliano Parties, in their Responsive Statement of Material Facts, admit that they did not submit income statements

for February 2014 or March 2014 with their April 9, 2014 letters and that, as of April 14, 2014, they were still in the process of being prepared. They admit that, "[a]part from documents produced in this litigation pursuant to a September 9, 2015 order from Magistrate Judge Schneider, the most recent monthly income statements provided by the Borrowers to CIBC had been for the month of January 2014, which CIBC had received on April 1, 2014." They further admit that, "without the referenced statements CIBC could not calculate the trailing twelve month NOI and DSCR."

On April 17, 2014, CIBC sent a letter identifying multiple conditions to the extension of the Maturity Date and identifying documents from the March 3 letter that still had not been provided. By way of a May 7, 2014 letter, CIBC informed the Juliano Parties that the maturity date would not be extended and that the loans would consequently mature on May 10, 2014.

The Court finds CIBC was within its right to decline to extend the maturity dates from May 10, 2014 to May 10, 2015 due to the Juliano Parties' failure to provide the information necessary for CIBC to calculate the trailing twelve-month debt service coverage ratio and net operating income requirements.[37]

---

[37] In their Supplemental Statement of Material Disputed Facts, the Juliano Parties argue that CIBC's approval of the extension period to May 10, 2014 "was an unequivocal statement to the Juliano Parties that, as of the date of the approval to renew,

Thus, the Court considers the loans as having matured as of May 10, 2014.[38] The Court must now address whether the Juliano Parties were excused from their obligation to make payment after

---

they were in compliance with all of the terms and conditions of the Loan Documents." They argue that "[h]ad the loan file not been complete, or had there been reporting deficiencies, for example, CIBC would not have renewed the Loans in 2013."

To the extent CIBC identified deficiencies in considering an extension to May 10, 2015 that existed when CIBC granted the extension to May 10, 2014, the Court finds the previous extension despite such deficiencies did not waive its right to require the Juliano Parties to strictly comply with the terms of the loan documents and their reporting requirements.

> [A] creditor's temporary forbearance in exercising its remedies upon its debtor's default does not preclude the creditor from subsequently exercising those rights. "Indeed, a contrary view would discourage lenders from allowing borrowers leeway and encourage those lenders to play hardball in the face of every default, no matter how minor."

Glenfed Fin. Corp., 647 A.2d at 859 (quoting Fasolino Foods Co., 961 F.2d at 1057).

[38] The Juliano Parties argue CIBC never had any intention of extending the maturity date of the Loans any further once they were transferred to Special Loans in July 2013, regardless of whether the NOI and DSCR targets were met. The Court finds CIBC's intention here irrelevant. Even if the Juliano Parties' allegation is correct and CIBC never intended to extend the maturity date and thus would not have approved an extension either way, as the Juliano Parties did not provide the requisite information to allow CIBC to extend the maturity dates, this allegation is inconsequential.

The parties also address the merits of whether an extension should have been granted, with much of the debate focusing on whether the satisfaction of the extension tests was to be determined on an individual basis or a combined basis. The Court does not reach this issue or reach a conclusion regarding whether the extension tests would have been satisfied if the relevant information had been provided. The point remains that the necessary documentation was not provided.

the maturity of the loans on May 14, 2014.

### b. Failure to Make Payments

"It is black letter contract law that a material breach by either party to a bilateral contract excuses the other party from rendering any further contractual performance." Magnet Res., Inc. v. Summit MRI, Inc., 723 A.2d 976, 981 (N.J. Super. Ct. App. Div. 1998) (citing Nolan v. Lee Ho, 577 A.2d 143 (1990)). "Whether conduct constitutes a breach of contract and, if it does, whether the breach is material are ordinarily jury questions." Id. at 982; accord Norfolk S. Ry. Co. v. Basell USA Inc., 512 F.3d 86, 92 (3d Cir. 2008) ("Whether the breach of a contract is material is generally an issue of fact."). "However, '[a]s is true of virtually any factual question, if the materiality question in a given case admits of only one reasonable answer (because the evidence on the point is either undisputed or sufficiently lopsided), then the court must intervene and address what is ordinarily a factual question as a question of law.'" Norfolk, 514 F.3d at 92 (quoting Gibson v. City of Cranston, 37 F.3d 731, 736 (1st Cir. 1994)). "Thus, in certain situations, it can be appropriate to determine the issue of material breach at the summary judgment stage." Id.

"[A] breach is material if it 'goes to the essence of the contract.'" Roach v. BM Motoring, LLC, 155 A.3d 985, 991 (N.J. 2017) (quoting Ross Sys. v. Linden Dari-Delite, Inc., 173 A.2d

258 (N.J. 1961)).  "To determine if a breach if material," the New Jersey Supreme Court "adopt[ed] the flexible criteria set forth in Section 241 of the Restatement (Second) of Contracts":

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; [and]
>
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Id. at 992 (quoting Restatement (Second) of Contracts § 241 (1981)).

As the implied covenant of good faith and fair dealing is incorporated into every contract under New Jersey law, the Court similarly finds that a breach of that covenant, if material, could excuse performance by the non-breaching party.  See Carvel Corp. v. Diversified Mgmt. Grp., Inc., 930 F.2d 228, 231 (2d Cir. 1991) ("Nothing in this instruction informed the jury that Carvel was under a duty to perform the contract in good faith and that a failure to do so could be considered a material breach."); Pizzeria Uno Corp. v. Pizza By Pubs, Inc., No. 09-

12015, 2011 WL 4020845, at *4 (D. Mass. Sept. 9, 2011) ("A party that violates its obligation of good faith and fair dealing cannot claim contract damages if and when the other party breaches the contract at issue."); Dorocon, Inc. v. Burke, No. 02-2556, 2004 U.S. Dist. LEXIS 29052, at *103 (D.D.C. Sept. 27, 2004) ("[I]f a jury determines that Plaintiff breached the implied duty of good faith and fair dealing, and if this breach is subsequently found to be material, then Defendants will have established a legal excuse for its failure.").

However,

> [u]nder basic contract principles, when one party to a contract feels that the other contracting party has breached its agreement, the non-breaching party may either stop performance and assume the contract is avoided, or continue its performance and sue for damages. Under no circumstances may the non-breaching party stop performance and continue to take advantage of the contract's benefits.

S & R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 376 (3d Cir. 1992); accord RNC Sys. v. Modern Tech. Grp., Inc., 861 F. Supp. 2d 436, 447-48 (D.N.J. 2012); Goldwell of N.J., Inc. v. KPSS, Inc., 622 F. Supp. 2d 168, 192 (D.N.J. 2009).

The Court previously determined that the Juliano Parties' breach of the implied covenant of good faith and fair dealing claim in the 14-3495 action must proceed to trial. These same issues, relevant in determining whether the Juliano Parties' performance can be excused, must proceed to trial as well. A

further issue to be resolved at trial is whether, if there was

such a material breach that could excuse performance, the

Juliano Parties continued to take advantage of the benefits of

the loan documents.[39]

---

[39] CIBC argues that if this Court finds they breached the Grande Village loan, that does not constitute a breach of the other loans, as the loans were only cross-defaulted as to defaults by the Juliano Parties. CIBC argues

> even a material breach of the Grande Village Mortgage would not have constituted a contractual breach between CIBC, on the one hand, and Willingboro or Grande Properties, on the other. Although an "Event of Default" by one Borrower triggers a cross-default of each Loan, there is no analogous cross-default provision applicable to alleged defaults by CIBC. Thus, not even the allegedly material breaches of the Grande Village Mortgage – if proven – would excuse Willingboro's and Grande Properties' failures to timely provide financial statements and cure default notices, as required prior to requesting a Second Extension Term.

The Cross-Collateralization Agreement provided as follows:

> [A]n Event of Default under any Note, any Security Instrument or any of the other Loan Documents delivered in connection with any individual Loan (as the term "Event of Default" is defined in each such Note and/or Security Instrument, as applicable) shall constitute an Event of Default under all Notes, all Security Instruments, and all thee Loan Documents delivered in connection with all other Loan or Loans, unless Lender elects otherwise in its sole and absolute discretion (as the term "Event of Default" is defined therein) . . . .

In all three original loan documents, the "Event of Default" definitions are all defined in terms of defaults by the Juliano Parties, not CIBC. The Court agrees with CIBC that a breach of one of the loan documents by CIBC would not constitute a breach of the other loan documents under the Cross-Collateralization Agreement. However, as the breach of the implied covenant of good faith and fair dealing claims that are proceeding in this

## 2. Breach of the Payment Guarantees

CIBC appears to allege two distinct breaches of the Payment Guarantees. First, CIBC argues William Juliano and Thomas Juliano breached the agreements by failing to maintain their required net worth. Second, CIBC argues William Juliano and Thomas Juliano breached the agreements by not making any payments on the loans as demanded by CIBC in its June 3, 2014 letters.

### a. Failure to Maintain Net Worth

Section 15 of the Willingboro "Performance and Completion Guaranty" and the Willingboro "Payment Guaranty" provide:

> Each Guarantor agrees to maintain the Net Worth Requirement . . . . Each Guarantor further agrees to deliver to Lender, within ninety (90) days of the end of each calendar year, current and dated financial statements certified by or on behalf of each Guarantor, detailing the assets and liability of said Guarantor, in form and substance reasonably acceptable to Lender, and in the same form, procedures and detail as the financial statements delivered to Lender in connection with the origination of the Loan, together with a certificate as to such Guarantor's Net Worth . . . and Liquid Assets . . . .

"Net Worth" was defined as "an amount equal to the aggregate of (1) the total assets of Guarantor determined in accordance with generally accepted accounting principles . . . , minus (b) the total liabilities of Guarantor determined in accordance with

---

case apply to all of the loan documents, the Court cannot say that the Grande Properties or Willingboro Loan Agreements were not breached at this time.

generally accepted accounting principles."  The "Net Worth Requirement" was thereafter set at $60,000,000.  The Willingboro "Loan Modification and Reaffirmation Agreement" redefined the "Net Worth Requirement" as $15,000,000.

The Grande Properties "Performance and Completion Guaranty" and the Grande Properties "Payment Guaranty" provide identically, except for defining the "Net Worth Requirement" as $70,000,000.  The Grande Properties "Loan Modification and Reaffirmation Agreement" also reset the "Net Worth Requirement" at $15,000,000.

The Grande Village "Performance and Completion Guaranty" reads identically to the Willingboro "Performance and Completion Guaranty" and also required a net worth of $60,000,000.  The Grande Village "Payment Guaranty" provides as follows: "Until the Loan is indefeasibly paid in full, Guarantor covenants and agrees to maintain a Net Worth of at least [$60,000,000] . . . ."  "Net Worth" was defined as "an amount equal to the aggregate of (a) the total assets of Guarantor determined in accordance with generally accepted accounting principles . . . , minus (b) the total liabilities of Guarantor determined in accordance with generally accepted accounting principles."  The Grande Village "Loan Modification and Reaffirmation Agreement" similarly reduced the net worth requirement to $15,000,000.

In the April 17, 2014 letter from CIBC with regard to

extending the maturity dates of the Willingboro and Grande

Village[40] loans, CIBC states:

> [W]e are in receipt of Mr. William T. Juliano's personal financial statement as of December 31, 2013 (received April 10, 2014).  We are also in receipt of Mr. Thomas E. Juliano's personal financial statement as of September 31 [sic], 2013 (received December 6, 2013). According to the statements, it appears that the Guarantors are in breach of (i) Section 15 of the Performance Guaranty and (ii) Section 15 of the Payment Guaranty, in each case for failing to maintain Net Worth (as defined therein) of at least $15,000,000.

CIBC argues "the most recent personal financial statement

received by CIBC from Thomas Juliano stated a Net Worth less

than $15,000,000, and the most recent personal financial

statement from William Juliano stated a [negative] Net Worth."

This Court has inspected Thomas Juliano's September 30,

2013 financial statement and agrees his net worth was reported

as less than $15,000,000.[41]  The Court has also inspected William

Juliano's December 31, 2013 financial statement.  This statement

lists total liabilities in excess of total assets.  CIBC viewed

---

[40]   This was not provided for in the Grande Properties letter.

[41]   The Juliano Parties reference a December 31, 2013 personal financial statement from Thomas Juliano, which purportedly shows a net worth greater than that reported in the financial statement referenced above.  It is unclear whether the December 31, 2013 personal financial statement was submitted to CIBC. Regardless, even using the December 31, 2013 figure, William Juliano and Thomas Juliano would not have jointly met the net worth requirement with William Julian's reported negative net worth.  Accordingly, the Court need not resolve this factual dispute.

this as equaling a negative net worth, calculated by subtracting the liabilities from his assets.  The Court concurs with this interpretation of the financial statement.

The Juliano Parties argue "Mr. Juliano erred in his statement by incorrectly including contingent liabilities as actual liabilities, which reduced his net worth below the required minimum net worth."  They argue that if his personal financial statement had been correctly prepared, it would have shown a net worth [that, combined with Thomas Juliano's, would have been in excess of $15,000,000]."  The Juliano Parties appear to blame this mistake on William Juliano being "in ill health" and on his "hurried[] prepar[ation]" of the statement.

In the Willingboro and Grande Properties loan documents, one of the "Events of Default" is defined as:

> If at any time or times any written warranty, representation, statement, report or certificate executed and delivered in connection with the Loan Documents and prepared now or hereafter by Borrower, Controlling Entity, Constituent Entity, [or Guarantor], proves to have been untrue, incorrect or misleading in any material respect when made or delivered.

The Grande Village loan document provides similarly.  The Court finds that whether this technical error in reporting the net worth constitutes a material breach of the guarantees constitutes a question of fact to be reserved for trial.  See Travelodge Hotels, Inc. v. Honeysuckle Enters., 357 F. Supp. 2d 788, 797 (D.N.J. 2005) ("Whether conduct constitutes a breach of

contract and, if it does, whether the breach is material are

ordinarily jury questions." (quoting <u>Magnet Res., Inc.</u>, 723 A.2d

at 981)).[42]

### b. Failure to Make Payments

In the June 3, 2014 letters, CIBC advised William Juliano

and Thomas Juliano that "the Borrower has failed to make payment

under the terms of the" loan documents and that "[t]he failure

to make such payment constitutes an additional Event of Default

under the Loan Documents."

For the Willingboro Loan, the June 3, 2014 letter stated:

> Pursuant to Section 1 of the Payment Guaranty, the
> Guarantors, jointly and severally, guaranteed payment of
> all Indebtedness, including, without limitation,
> principal (up to the Principal Guaranty Amount),
> interest and other sums set forth therein. As of June
> 2, 2014, the aggregate amount outstanding under the Loan
> Documents is not less than $6,341,914.00, including,
> without limitation, principal, interest and fees.
> Taking into account the cap on principal (the Principal
> Guaranty Amount is $15,579,585.00), the amount due and
> payable under the Payment Guaranty is not less than
> $3,294,138.00 as of June 2, 2014.

For the Grande Village loan, the June 3, 2014 letter

stated:

> Pursuant to Section 2 of the Payment Guaranty, the
> Guarantors, jointly and severally, guaranteed payment of

---

[42] The Juliano Parties further argue, "[a]s an experienced
banker, and based on personal financial statements that had
previously been provided by Mr. Juliano, Mulkeen should have
realized Mr. Juliano's error and resolved this with him without
alleging that it was an additional default." The Juliano
Parties point to nothing in any of the loan documents that
imposes such a duty on CIBC.

all Indebtedness, including, without limitation, principal (up to $4,200,000 subject to the occurrence of a Springing Recourse Event), interest and other sums set forth therein. As of June 2, 2014, the aggregate amount outstanding under the Loan Documents is not less than $6,742,407.00, including, without limitation, principal, interest and fees. Taking into account the cap on principal, the amount due and payable under the Payment Guaranty is not less than $4,523,614.00 as of June 2, 2014.

For the Grande Properties loan, the June 3, 2014 letter stated:

Pursuant to Section 1 of the Payment Guaranty, the Guarantors, jointly and severally, guaranteed payment of all Indebtedness, including, without limitation, principal (up to the Initial Principal Guaranty Amount), interest and other sums set forth therein. As of June 2, 2014, the aggregate amount outstanding under the Loan Documents is not less than $32,418,520.00, including, without limitation, principal, interest and fees. Taking into account the cap on principal, the amount due and payable under the Payment Guaranty is not less than $16,838,935.00 as of June 2, 2014.

The June 3, 2014 letters all asked for William Juliano and Thomas Juliano to "please promptly advance payment" to CIBC.

The Juliano Parties admit William Juliano and Thomas Juliano have not paid any portion of the amounts demanded by CIBC in its June 3, 2014 letters. The Court finds no reasonable jury could conclude this was not a material breach of contract. Accordingly, this Court determines on summary judgment that the Juliano Parties materially breached their guarantees by not making payment on the loans. However, the Juliano Parties claim they were excused from making payments due to the material

breaches of contract by CIBC.  Whether CIBC committed a material breach of contract, through a breach of the implied covenant of good faith and fair dealing, is a question of fact to be reserved for trial.  Accordingly, summary judgment on this claim is denied.

## C. The 14-5047 Counterclaims by the Juliano Parties Against CIBC

### 1. Breach of the Loan Sale Agreement

In their 14-5047 counterclaims, the Juliano Parties argue CIBC materially breached the Loan Sale Agreement.  The parties do not contest that the Loan Sale Agreement is a valid contract between the parties.  As to the "failure of the defendant to perform its obligations under the contract," the Juliano Parties allege the following breaches: (1) "triggering the requirement that the Juliano parties make a bid even though CIBC was not in fact contemplating a sale of the Loans" and (2) "creating circumstances under which the Juliano Parties could not possibly submit a bid."  Specifically, the Juliano Parties argue CIBC prevented them from making a bid by "declaring nonexisting, non-monetary technical defaults before noticing the sale of the notes in order to deprive the Juliano Parties of their rights under the Loan Sale Agreement."  They argue these defaults, and the 14-5047 lawsuit, prevented them from securing the financing necessary to bid on the loans, given the impact of these

circumstances on their creditworthiness.  They refer to this as
"a classic 'Catch 22' situation" in that they "required [the
Juliano Parties] to bid by October 15th, but [they] could not
bid by October 15th."  They further argue it was a breach to
declare the Loan Sale Agreement null and void after the Juliano
Parties did not place a bid.

The Juliano Parties argue CIBC never intended a sale of the
loans when they issued the Loan Sale Notice.  The Juliano
Parties rely on the deposition of Mulkeen for this assertion, in
which he testified as follows:

> Q.    Did CIBC consider selling the notes to the Julianos
>       after it sent the Juliano parties notice of its
>       intention to sell the notes?
>
> A.    Yes, we did.
>
> Q.    Tell me what happened and who considered it.
>
> A.    . . . So when the bank – when in October 2014, was
>       looking to estimate its loan loss provision, we
>       needed financial information – or we needed data as
>       to what the value of the loans would be and we went
>       out to four brokers.  Because we went out to four
>       brokers, counsel felt that that was considering a
>       sale of the loan, so we sent the letter to the
>       Julianos saying – asking if they were – to
>       paraphrase – asking if they were interested in
>       acquiring the notes.
>
> Q.    Did you tell them what number you were looking for
>       from them?
>
> A.    No, we did not.
>
>       . . . .
>
> Q.    . . . Had you received opinions by this point in

time from the four companies that you went out to as to what they perceived to be the appropriate price for the note sales?

A.    I'm not certain that on October 9th we received the brokers' opinions of values there the three other brokers, but on October 9th Eric summarized DebtX's value and DebtX was one of the four brokers.

Q.    And the brokers' opinion of value is the opinion of value of the note sale, correct?

A.    I believe it's the – correct, it specifically references a note sale.

        .  .  .  .

Q.    And did you select a particular brokers' opinion of value?

A.    Yes, we did, for provision purposes.

        .  .  .  .

Q.    Now, based upon the information that you received, you decided not to go forward with the note sale, correct?

A.    That's correct.

Q.    Why did you do that?

A.    The values that HFF and others were proposing that the market would pay were below our expectations and below the threshold that we were willing to take.

Q.    What was that threshold?

A.    Par.

Q.    And what were your expectations?

A.    Par.

Q.    Why would you go out and sell the note?

A.   We didn't go out and sell the note.

Q.   No, why would you even consider selling the notes
     if our expectations were that you were going to get
     paid on par?

A.   The purpose of going out to get brokers' opinions
     of value was to support the bank's provision
     recommendation and also if there was a good number,
     we would have moved forward with a note sale.   So
     there w[ere] actually two purposes: One, provision
     but, two, if we got a good number, we would
     certainly consider moving forward.

CIBC states that it requests brokers' opinions of value "for two
reasons: (i) to determine the value of the Loans for loss
provisioning purposes, a regulatory requirement, and (ii) to
make a decision as to whether to sell the Loans depending upon
the price offered in the marketplace."

The Court finds there exists a question of fact as to
whether CIBC was "considering the sale of any or all of the
Loans" at the time it notified the Juliano Parties.   CIBC viewed
its reaching out to brokers for an estimate on its loan loss
provision to be considering the sale of the loans, which the
Juliano Parties argue does not constitute consideration of a
sale.   The Court finds this is a question of fact.   If CIBC was
not in fact considering a sale of the loans, CIBC would have
improperly started the clock on the Juliano Parties' right to
bid, constituting a breach of the Loan Sale Agreement.   The
Court will deny summary judgment on this breach of contract
claim on this basis.

However, as to the allegation that CIBC created circumstances that precluded the Juliano Parties from being able to submit a bid, even if the Juliano Parties' allegations are true, the Court can discern no breach of the contract terms related to the Juliano Parties' inability to place a bid for the loans.

### 2. Breach of the Implied Covenant of Good Faith and Fair Dealing

The Juliano Parties argue, in the alternative, that CIBC breached the covenant of good faith and fair dealing by "retaliating against the Juliano Parties by filing this lawsuit," "seeking to collect more than $46,000,000.00 against the Guarantors who are not liable for such an amount," and "depriving the Juliano Parties of their rights under the Loan Sale Agreement by declaring . . . nonexistent defaults before noticing the sale of the notes." According to the Juliano Parties, these acts left them unable to place a bid, resulting in CIBC declaring the Loan Sale Agreement null and void.

The Juliano Parties' breach of the implied covenant of good faith and fair dealing claim must necessarily proceed to trial as well, as an alternative basis for the breach of contract claim. Summary judgment will be denied on this claim.

### V. Consolidation

Federal Rule of Civil Procedure 42(a) provides: "If actions

before the court involve a common question of law or fact, the court may . . . consolidate the actions." These cases have already been consolidated for discovery and case management purposes. The Court finds several common questions of fact will need to be resolved at trial, warranting consolidation of this case. Principally, whether there were material breaches of contract by CIBC in the 14-3495 matter needs to be resolved in the 14-5047 matter to determine whether the Juliano Parties' performance under the loan agreements was excused.

This case will proceed under the earlier-filed docket, the 14-3495 action.

## VI. Conclusion

In sum, as this case stands, the following claims will proceed to trial in this consolidated matter:

With regard to the 14-3495 claims, the following issues must be decided at trial:

A. The 14-3495 claims by the Juliano Parties Against CIBC

   1. Breach of the Implied Covenant of Good Faith and Fair Dealing
      a. Declaring Defaults
      b. Subsequent Advance Conditioned on Sale of the Property
      c. Delay in Granting the Subsequent Advance
      d. Transfer to Special Loans
   2. Declaratory Judgment

B. The 14-5047 Claims by CIBC Against the Juliano Parties

   1. Breach of Loan Agreements
      a. Failure to Make Payments

2. Breach of the Payment Guarantees
              a. Failure to Maintain Net Worth
              b. Failure to Make Payments

    C. The 14-5047 Counterclaims by the Juliano Parties Against
       CIBC

         1. Breach of the Loan Sale Agreement
         2. Breach of the Implied Covenant of Good Faith and Fair
            Dealing

    An appropriate Order will be entered.


Date:  __March 30, 2018__          __s/ Noel L. Hillman____
At Camden, New Jersey              NOEL L. HILLMAN, U.S.D.J.