Adam K. Derman, Esq.
David M. Dugan, Esq.
CHIESA SHAHINIAN & GIANTOMASI PC
One Boland Drive
West Orange, NJ 07052
Telephone: (973) 325-1500
Facsimile: (973) 325-1501

*Attorneys for CIBC INC. and Canadian Imperial Bank of Commerce, New York Agency*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| GRANDE VILLAGE LLC, et al., <br><br> Plaintiffs, <br><br> v. <br><br> CIBC INC., et al., <br><br> Defendants | ECF Case <br><br> CIVIL ACTION NO.: 14-CV-03495-NLH-JS |
| CIBC INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> GRANDE VILLAGE LLC, et al., <br><br> Defendants. | |

## BRIEF IN SUPPORT OF CIBC'S MOTION TO EXCLUDE TESTIMONY OF THE JULIANO PARTIES' EXPERT, HAL J. MICHELS, CPA

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

LEGAL STANDARD................................................................................................... 3

ARGUMENT ............................................................................................................... 4

POINT I -- MICHELS IS NOT INDEPENDENT AND OBJECTIVE........................ 4

    A.    Michels Has A Significant Financial Interest In The Juliano Parties ................... 5

    B.    Michels Bases His Opinions On His Own Prior Work........................................ 6

    C.    Michels Substitutes The Self-Interested Representations of the Julianos For His Own Judgment ..................................................................................... 8

    D.    Michels Is Aware Of, But Improperly Dismisses, His Conflicts Of Interest ........ 9

POINT II -- MICHELS EXCEEDS THE SCOPE OF PROPER EXPERT TESTIMONY ........ 10

    A.    Michels Exceeds the Scope of His Rebuttal Engagement ................................... 10

    B.    Michels Opines Outside of His Accounting Expertise ........................................ 12

          1.    Opinions concerning "sound banking practices".................................... 12

          2.    Opinions concerning architectural and construction plans ..................... 13

    C.    Improper Legal Conclusions................................................................................ 13

POINT III -- MICHELS'S DAMAGES CALCULATIONS ARE FUNDAMENTALLY FLAWED.................................................................... 14

    A.    Unfounded And Improper Conclusions Concerning Mitigation Of Damages.............................................................................................................. 15

          1.    Michels improperly concludes that mitigation is not required by law....................................................................................................... 15

          2.    Michels fails to perform any systematic mitigation analysis.................. 15

    B.    Failure To Connect The Juliano Parties' Alleged Losses to CIBC's Conduct............................................................................................................... 16

          1.    Michels fails to establish a causal connection between CIBC's conduct and a decline in the value of Grande Village ............................ 17

          2.    Michels fails to establish a causal connection between CIBC's conduct and alleged out-of-pocket expenses incurred by Grande Village............................................................................................. 17

    C.    Flawed Analysis Of The Juliano Parties' "Equity Contributions" ..................... 17

    D.    Reliance Upon Unverified And Untested Data.................................................... 19

          1.    Failure to verify the accuracy of appraised values at Grande Village....................................................................................................... 20

## TABLE OF CONTENTS
(continued)

**Page**

2.      Failure to prove that invoices relating to the Build-Out were paid.......... 21

E.      Failure To Account For The Costs Of Completing The Build-Out ..................... 21

CONCLUSION................................................................................................................. 23

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Chelsea Check Cashing, L.P. v. Toub*,
Civ. Act. No. 02-5557, 2006 WL 54303 (D.N.J. Jan. 9, 2006) ...............................................4

*Clientron Corp. v. Devon IT, Inc.*,
Civ. Act. No. 13-05634, 2016 WL 1255218 (E.D. Pa. Mar. 29, 2016)....................................12

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993).............................................................................................................1, 4

*Schneider ex rel. Estate of Schneider v. Fried*,
320 F.3d 396 (3d Cir. 2003)......................................................................................................3

*Folden v. Wash. State Dep't of Soc. & Health Servs.*,
744 F. Supp. 1507 (W.D. Wash. 1990), *aff'd*, 981 F.2d 1054 (9th Cir. 1992) .........................5

*Haskins v. First Am. Title Ins. Co.*,
Civ. Act. No. 10-5044, 2013 WL 5410531 (D.N.J. Sept. 26, 2013) ......................................11

*Holman Enters. v. Fid. Guar. Ins. Co.*,
563 F. Supp. 2d 467 (D.N.J. 2008) ........................................................................................13

*Inline Connection Corp. v. AOL Time Warner Inc.*,
470 F. Supp. 2d 435 (D. Del. 2007)..........................................................................................4

*James T. Scatuorchio Racing Stable, LLC v. Walmac Stud Mgmt., LLC*,
Civ. Act. No. 11-374, 2014 WL 1744848 (E.D. Ky. Apr. 30, 2014) .......................................4

*JMJ Enters.*, Civ. Act. No. 97-cv-0652, 1998 WL 175888 (E.D. Pa. Apr. 15,
1998), *aff'd*, 178 F.3d 1279 (3d Cir. 1999)...........................................................................22

*JMJ Enters., Inc. v. Via Veneto Italian Ice, Inc.*,
Civ. Act. No. 97-cv-0652, 1998 WL 175888 (E.D. Pa. Apr. 15, 1998), *aff'd*,
178 F.3d 1279 (3d Cir. 1999)..................................................................................................14

*In re Johnson & Johnson Derivative Litig.*,
900 F. Supp. 2d 467 (D.N.J. 2012) ...................................................................................8, 21

*Karlo v. Pittsburgh Glass Works, LLC*,
No. 2:10-CV-1283, 2015 WL 4232600 (W.D. Pa. July 13, 2015) ...........................................8

*Leon v. Kelly*,
Civ. Act. No. 07-0467, 2009 WL 1300936 (D.N.M. Jan. 12, 2009) ......................................12

*Perez v. First Bankers Trust Servs., Inc.*,
    Civ. Act. No. 12-4450, 2015 WL 5722843 (D.N.J. Sept. 29, 2015) ......................................14

*Polsby v. Shalala*,
    925 F. Supp. 379 (D. Md. 1996) .................................................................................................4

*United States v. 99.66 Acres of Land*,
    970 F.2d 651 (9th Cir. 1992) ...................................................................................................20

*Warren Distrib. Co. v. InBev USA L.L.C.*,
    Civ. Act. No. 07-1053, 2010 WL 2179167 (D.N.J. May 28, 2010) ......................................14

*Wehman v. State Farm Fire & Cas. Co.*,
    Civ. Act. No. 14-1416, 2015 WL 5167184 (D.N.J. Sept. 3, 2015) ..........................................3

*Wonderland Nurserygoods Co., Ltd. v. Thorley Indus., LLC*,
    Civ. Act. No. 12-196, 2013 WL 6328772 (W.D. Pa. Dec. 5, 2013)........................................16

## Other Authorities

Fed. R. Civ. P. 26(a)(2)(B)(i)...........................................................................................................11

Fed. R. Evid. 702 ...............................................................................................................................1

CIBC INC. and Canadian Imperial Bank of Commerce, New York Agency ("CIBC")[1] respectfully submit this Brief in Support of CIBC's Motion to Exclude Testimony of the Juliano Parties' Expert, Hal J. Michels,[2] pursuant to Federal Rule of Evidence 702, and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

## PRELIMINARY STATEMENT[3]

On January 29, 2016, CIBC served the Expert Report of Craig P. Casey ("Casey Report"),[4] which provides Mr. Casey's expert opinions and conclusions concerning damages issues relevant to these Actions.  In response to the Casey Report, the Juliano Parties summoned their own longtime private accountant, Hal Michels, to prepare a purported rebuttal report (the Report), which was served on March 21, 2016.  Despite clear conflicts of interest—which Michels himself raised but was persuaded by the Juliano Parties' to ignore—Michels seeks to testify as to scattershot and unsupported opinions on a vast array of issues, none of which satisfy the admissibility requirements of this Court.  As set forth in further detail below, the Court

---

[1] Unless otherwise indicated herein, capitalized terms shall have the meanings ascribed to them in CIBC's May 2, 2016 Motion for Summary Judgment ("CIBC's Summary Judgment Motion").  CIBC is filing certain documents attached to the accompanying Declaration of Jarman D. Russell under seal and is redacting the publicly filed versions of certain documents pursuant to the Juliano Parties' confidentiality designations and the position they took by way of their prior motion to seal, which was granted by the Court in its December 19, 2016 Order.  CIBC will file a motion to seal as required under the Local Rules.

[2] A copy of the Expert Report of Hal J. Michels, dated March 21, 2016 ("Report"), is attached as Exhibit A to the Declaration of Jarman D. Russell ("Russell Decl.").  A copy of the transcript from Mr. Michels's April 22, 2016 deposition is attached as Exhibit B to the Russell Decl.  All citations to "Dep. Tr." refer to this transcript.

[3] This motion to exclude Mr. Michels's testimony respectfully assumes the Court's familiarity with the background of these Actions, as set forth in CIBC's Summary Judgment Motion and other filings in these Actions.  In the interests of brevity and judicial economy, CIBC does not restate that factual background in this motion.

[4] A copy of the Casey Report is attached as Exhibit C to the Russell Decl.

should exclude all purported expert opinions proffered by Mr. Michels for at least the following reasons.

*First*, the bulk of Michels's opinion has been rendered moot by the Court's conlusion, in its March 30, 2018 summary judgment opinion, that the maturity date for the loans was May 10, 2014. In fact, of the seven pages of purported "analysis" in Michels's report, four pages pertain exclusively to the loan extension issue, which is now out of the case. As demonstrated below, the remaining three pages of "analysis" are fatally flawed.

*Second,* Michels fails to satisfy the threshold independence and objectivity requirements for reliable expert testimony.  For roughly 20 years, Michels has provided private accounting and business consulting services to William and Thomas Juliano personally, as well as to all of their many wholly-owned commercial entities—specifically including the Borrowers.  Michels's accounting firm is the sole provider of such services to the Juliano Parties, and Michels himself is the primary engagement partner for all Juliano-affiliated work.  Such work generates roughly $100,000 a year in revenue for Michels's small accounting firm.  Thus, Michels has a direct and substantial financial interest in the Juliano Parties (including, specifically, the outcome of this lawsuit), and his expert engagement violates numerous professional standards and judicial admissibility requirements.  Michels's lack of independence is confirmed in his expert opinions by his repeated willingness to accept the Julianos' self-interested factual representations rather than conducting independent analyses of key disputed issues.  His independence is further compromised by his reliance on his own prior work product as purported foundation for his opinions.  Michels's total lack of independence permeates and infects all of his opinions, rendering the entirety of his proffered testimony unreliable and inadmissible.

*Third*, the overwhelming majority of Michels's testimony exceeds the proper scope of rebuttal testimony from an accounting expert.  Roughly 70% of his report is devoted to issues unrelated to any of Craig Casey's opinions and, thus, constitutes improper "rebuttal" testimony. Michels also offers numerous legal conclusions concerning issues of contract interpretation, good faith, banking standards, and construction planning which are properly within the province of the Court and far beyond the limits of Michels's supposed accounting expertise.

*Fourth*, Michels's limited opinions on damages rely upon calculations and assumptions which are so fundamentally flawed that his testimony may be excluded on that independent basis.  Among other basic failings, Michels:  (i) undertakes no systematic analysis of the Juliano Parties' purported efforts to mitigate their alleged damages; (ii) fails to connect the Juliano Parties' claimed economic losses to any allegedly harmful conduct by CIBC; (iii) relies upon completely untested and unverified property valuations of Grande Village; (iv) admittedly miscalculates the amount and recoverability of the Juliano Parties' "equity contributions" to the Properties; and (v) admittedly ignores cost factors which completely undermine his "final conclusion" that the values of the Properties exceeded the Juliano Parties' debt obligations to CIBC when the Loans matured in May 2014.  The Court need not—and should not—admit into evidence such fundamentally flawed damages calculations because they fail to satisfy the professional standards of accounting experts.

## LEGAL STANDARD

"The United States Court of Appeals for the Third Circuit has explained that Rule 702 sets forth three separate restrictions on the admission of expert testimony: qualification, reliability, and fit." *Wehman v. State Farm Fire & Cas. Co.*, Civ. Act. No. 14-1416, 2015 WL 5167184, at *3 (D.N.J. Sept. 3, 2015) (citing *Schneider ex rel. Estate of Schneider v. Fried,* 320

F.3d 396, 404 (3d Cir. 2003)).  The proponent of proffered expert testimony must establish its

admissibility by a preponderance of the evidence.  *Daubert*, 509 U.S. at 592 & n.10.

## ARGUMENT

## POINT I

## MICHELS IS NOT INDEPENDENT AND OBJECTIVE

The independence and objectivity of an expert are necessary elements of the reliability of

his testimony.  Thus, "[a] lack of independence as an expert witness destroys his credibility."

*Polsby v. Shalala*, 925 F. Supp. 379, 393 (D. Md. 1996); *see also James T. Scatuorchio Racing*

*Stable, LLC v. Walmac Stud Mgmt., LLC*, Civ. Act. No. 11-374, 2014 WL 1744848, at *7 (E.D.

Ky. Apr. 30, 2014) ("[I]f an expert is not independent . . . he or she lacks the required credibility

to be of any assistance to the trier of fact.").

For accounting experts, courts look to the published guidelines of the American Institute

of Certified Public Accountants ("AICPA") to determine the standards of independence and

objectivity to which accountants must be held.  AICPA guidelines dictate whether "the type of

information and manner in which it was acquired is reasonably relied upon by experts within [the

accounting] field," *Inline Connection Corp. v. AOL Time Warner Inc.*, 470 F. Supp. 2d 435, 443

(D. Del. 2007), and "the application of the AICPA Guidelines should be similar to the

application of the Rules of Professional Conduct ("RPCs"), which governs the conduct of

attorneys." *Chelsea Check Cashing, L.P. v. Toub*, Civ. Act. No. 02-5557, 2006 WL 54303, at *3

(D.N.J. Jan. 9, 2006).

Critically, the AICPA Code of Professional Conduct ("Code of Professional Conduct")[5]

identifies specific threats to objectivity and independence which Michels flouts.  Most notably,

_____

[5] A copy of the AICPA Code of Professional Conduct is attached as Exhibit D to the Russell
Decl.

the Code of Professional Conduct provides that an accountant must remain "free of conflicts of interest" by avoiding "relationships that may appear to impair a [AICPA] member's objectivity" specifically including "provid[ing] forensic accounting services to a client in litigation."  Ex. D (Code of Professional Conduct, §§ 0.300.050.01; 0.300.050.02; 1.000.010.11(a)) at 6, 25.[6] Because Michels fails to remain free of conflicts of interest for at least the reasons discussed below, his testimony is unreliable and should be excluded in its entirety.

### A.      Michels Has A Significant Financial Interest In The Juliano Parties

The Code of Professional Conduct states that an accountant must avoid the "self-interest threat" which results when a "member has a financial interest in a client, and the outcome of a professional services engagement may affect the fair value of that financial interest."  Ex. D at 25.  Courts, thus, hold that an accountant is most likely "a partisan" and "not an independent expert" when he has "a substantial personal financial interest in the outcome" and where "he stands to get more income from accounting work if the [party engaging him] prevail[.]"  *Folden v. Wash. State Dep't of Soc. & Health Servs.*, 744 F. Supp. 1507, 1522 (W.D. Wash. 1990) (citations and quotations omitted), *aff'd*, 981 F.2d 1054 (9th Cir. 1992).  Michels has for many years derived substantial revenue from ongoing accounting work performed for the Juliano Parties.  Thus, a negative outcome for the Juliano Parties in this litigation will threaten that revenue stream and negatively impact Michels's financial interests.

Michels concedes that his Report fails to disclose his longstanding business relationship with the Juliano Parties.  *See* Dep. Tr. 29:20-30:6.   Nevertheless, Michels is the main

---

[6] Michels has been continuously employed as an accountant since 1980 and has been a member of the AICPA since that time.  *See* Dep. Tr. 18:10-19.  Michels acknowledges that his firm expects its members to comply with the Code of Professional Conduct.  *See* Dep. Tr. 19:7-12 ("Q.  Does your firm expect its members to comply with the AICPA code of conduct?  A.  Yes. Q.  That's very important to you, correct?  A.  Yes.").

engagement partner at his firm for all of the Julianos' commercial entities:  and, to his knowledge, no other accounting firms serve the Julianos.  *See* Dep. Tr. 45:16-23.  Michels has been providing personal accounting services to William and Thomas Juliano, as well as their numerous commercial entities, for approximately 20 years.  *See* Dep. Tr. 45:24-46:11.  Michels has provided services to each of the Borrowers since their inception (*see* Dep. Tr. 36:10-37:23), including "accounting and tax services, preparation of their tax returns, tax planning and advice, and other business consulting services as needed" (Dep. Tr. 57:14-21).  Michels admits that, for both the past three-year and ten-year periods, the Julianos and their commercial entities have comprised one of his five largest clients (*see* Dep. Tr. 50:10-20) and he derived approximately $100,000 in revenue from Juliano-affiliated work in 2015 alone (*see* Dep. Tr. 50:21-23).

As a partner in his firm, Michels's personal income is tied to the fees he generates in performing work for as the Julianos.  *See* Dep. Tr. 62:18-63:7.[7]  Thus, any litigation outcome which limits the Borrowers' future needs for accounting services (*e.g.*, if the Julianos lose the Borrowers or the Properties) or which impairs the Julianos Parties' ability to pay for accounting services will directly and adversely impact Michels's financial interests.

### B.      Michels Bases His Opinions On His Own Prior Work.

Not only are Michels's financial interests at stake in these Actions, but so is his own prior work product.  The Code of Professional Conduct provides that an accountant must avoid the "self-review threat" which results when a "member relies on the work product of the member's firm" Ex. D. at 28–29, ¶ 15(a)).  This charge recognizes the simple reality that one's objectivity is inherently compromised when reviewing the quality and integrity of one's own work.  Michels

---

[7] "Q.  Did you bring in the Juliano parties as a client?  A.  Yes. . . .  Q.  Is your personal revenue at all dependent on the amount of fees that you originate as a partner?  A.  Yes.  Q.  Is it fairly substantially related to the amount of revenue you derive or originate as a partner?  A.  Yes."

explicitly acknowledges this risk, yet his Report, nevertheless, analyzes his own prior work product as foundation for his opinions.  *See* Dep. Tr. 26:21-27:18.[8]

In fact, Michels's prior work is so inextricably intertwined in his opinions that, to prepare his Report, he searched his own files for relevant documents rather than relying on documents produced by the parties during fact discovery.  *See* Dep. Tr. 93:13-16.  Michels further admits that he prepared the majority of the Julianos' personal financial statements—a key category of disputed documents which is directly relevant to the Default Notices which the Juliano Parties contest in these Actions.  *See* Dep. Tr. 240:8-11.[9]

Thus, Michels's opinions concerning ███████████████████████████ ████████████████████████████████████████████████████████████████ improperly opine on Michels's own prior work product.  Such testimony lacks independence and objectivity and should, therefore, be excluded.

---

[8] "Q.  . . . If a member of the AICPA relies on work product that he provided to a client as part of the basis for his expert report, do you see a risk?  MR. GARBER:  Same objection.  A.  Do I see a risk?  Potentially.  Q.  And that is a risk that the report might not be objective, correct?  A.  No.  There is – yes.  Yes.  Q.  So there is a risk.  A.  There is a risk.  Q.  Lack of objectivity, correct?  A.  Yes.  Q.  And in your expert report, you reference documents that you prepared in the regular course of providing accounting services to the Juliano parties, correct?  A.  Yes.  Q.  So you are offering expert opinions at least in part on some of your own prior work product, correct?  A.  Yes."

[9] In fact, Michels's direct involvement in revising one disputed personal financial statement directly contradicts the conclusions he and Mr. Fellheimer reach.  Although Michels and Fellheimer both opine that *CIBC* should have independently restated and corrected material errors in William Juliano's December 31, 2013 personal financial statement, Michels himself failed numerous times to correct these very same errors.  Michels did not correct these errors because he believed that William Juliano preferred not to correct them (*see* Dep. Tr. 247:13-20); by contrast, Michels admits that CIBC lacked sufficient insight into Juliano's affairs to independently correct these errors which Michels had willfully ignored (*see* Dep. Tr. 252:17-253:7).

### C.   Michels Substitutes The Self-Interested Representations of the Julianos For His Own Judgment

Michels's lack of independence and objectivity is further confirmed by his willingness to rely upon the unverified and self-serving representations of the Julianos.  This District requires that any expert—specifically including an accounting expert—must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *In re Johnson & Johnson Derivative Litig.*, 900 F. Supp. 2d 467, 493 (D.N.J. 2012) (citations omitted).  In particular, "***any expert should be aware that a party and counsel in a litigation have an interest in the outcome and that an expert study should not be dependent on the information they supply***."  *Karlo v. Pittsburgh Glass Works, LLC*, No. 2:10-CV-1283, 2015 WL 4232600, at *7 (W.D. Pa. July 13, 2015) (emphasis added) (citation and quotation omitted).[10]  Nevertheless, Michels relies on the Julianos' representations to him in the course of preparing his Report concerning numerous disputed facts rather than reviewing (much less considering) the deposition testimony of the Juliano Parties' witnesses.[11]

For example, Michels opines 

Michels Report at 4.  Michels admits that his *only* foundation for

_____

[10] These requirements comport with Code of Professional Conduct Rule 102-6, which "[r]equires (members to) maintain objectivity and integrity and prohibits subordination of judgment to others."  Similarly, the Litigation Services and Applicable Professional Standards publication 03-1 of the AICPA provides that:  "The expert does not serve as an advocate for the client's position and, therefore should not subordinate his or her judgment to the client."  Litigation Services and Applicable Professional Standards, American Institute of Certified Public Accountants, Inc., Rule 102, Integrity and Objectivity, p. 3, ¶ 13.

[11] Michels failed to review the deposition transcripts of the Juliano Parties' witnesses— transcripts which in many cases undermine his factual conclusions and which were explicitly referenced in the Casey Report which he purports to rebut.  *See* Dep. Tr. 33:3-14; 34:14-19.

-8-

concluding that this document was provided to CIBC "on or about February 27, 2013" was "something that Bill Juliano told [him]" while Michels was preparing the Report.  *See* Dep. Tr. 292:10-293:21.[12] Similarly, Michels relies solely upon his conversations with Thomas Juliano to conclude that any attempt by the Juliano Parties to mitigate their alleged damages at Grande Village by commencing the Build-Out after January 21, 2014, would have been "uneconomical." *See* Dep. Tr. 182:24-183:16.[13]

Such mindless, unquestioning reliance on the Julianos' self-interested (and hotly disputed) factual narrative in these Actions does not come close to satisfying the indispensible reliability prescription for admissibility.  Michels's reliance on the Julianos' representations as to disputed facts while he was actually preparing the Report underscores his complete lack of credibility.

### D.     Michels Is Aware Of, But Improperly Dismisses, His Conflicts Of Interest

Michels concedes that he "considered" declining this engagement because of obvious conflicts of interests; in fact, he only accepted to take on this matter based on assurances from *counsel* to the Juliano Parties' that doing so would not be improper.  *See* Dep. Tr. 65:9-67:14.[14]

---

[12] *See also* Dep. Tr. 293:6-21 ("Q.  There is no transmittal memo to [exhibit] F5 [to your Report] that indicates whether or not this document was actually submitted to CIBC, right?  A.  Correct. Q.  So, as you sit here today, you don't know if, in fact, this document was ever submitted to CIBC, correct?  A.  I know just from conversation I had with – the question was asked to Bill[.]"); Dep. Tr. 294:2-9 ("Q.  [You asked that question] [w]hile you were preparing this expert report, correct?  A.  Yes.").

[13] "Q.  So your understanding that it would not have made sense to begin construction after July [sic] 21, 2014, is based on comments that were made to you by Bill Juliano?  A.  Tom Juliano. Q.  Tom Juliano, OK.  And you never made an independent assessment as to whether or not it would not have made sense to start the buildout after January 21, 2014, correct?  A.  I did not."

[14] "Q. When you were contacted in connection with this assignment, did it occur to you to decline the engagement for any reason?  A.  I considered it, and I actually had the conversation with Mr. Braverman . . . and based on that discussion, I decided to accept it.  .. . . . .   Q.  When Mr. Braverman initially approached you, are you the one that raised the issue that you might have a conflict of interest based on the prior work you had done for the borrowers?  A.  Yes.  . . . I asked

Although Michels raised these glaring conflicts of interest with counsel for the Juliano Parties in the Actions, he failed to even raise these conflicts with relevant third parties. Notably, Michels never discussed these conflicts with the three other partners in his firm, nor did he discuss them with his professional liability insurance carrier. *See* Dep. Tr. 68:14-19. Instead, Michels relied solely upon his own biased judgments and those of counsel for the Juliano Parties to conclude that he is, somehow, not terminally conflicted merely because "the nature of [the accounting] profession, is to be independent and objective[.]" *See* Dep. Tr. 22:5-12. Concluding that all accountants are "independent and objective" by nature creates an exception that swallows the AICPA rules on conflicts of interest. Michels cannot establish independence and objectivity in the face of numerous clear conflicts of interest. Thus, all of Michels's proffered testimony should be excluded as inherently unreliable.

## POINT II

### MICHELS EXCEEDS THE SCOPE OF PROPER EXPERT TESTIMONY

#### A.   Michels Exceeds the Scope of His Rebuttal Engagement

Michels does not provide—and was never asked to provide—affirmative expert opinions.[15] Instead, Michels defines the scope of his expert engagement as follows:



Report at 1 (emphasis added). Therefore, the scope of

---

Mr. Braverman was he concerned about a potential conflict. . . . And Mr. Braverman was OK, and as I said before, we then moved forward on the engagement."

[15] Pursuant to the relevant Scheduling Orders, affirmative expert disclosures and opinions were required to be served no later than January 29, 2016. The Michels Report was served on March 21, 2016.

the Report must be limited to issues necessary to rebut the proffered testimony of Mr. Casey and to quantify the Juliano Parties' purported losses.[16]

This District limits the scope of rebuttal expert testimony to opinions and information "'*intended solely to contradict or rebut* evidence on the same subject matter identified by another party.'" *Haskins v. First Am. Title Ins. Co.*, Civ. Act. No. 10-5044, 2013 WL 5410531, at *2 (D.N.J. Sept. 26, 2013) (quoting Fed. R. Civ. P. 26(a)(2)(B)(i)) (emphasis added) (additional citations omitted).  Mr. Casey's initial expert report, dated January 29, 2016, opines that: ███████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████ Casey Report at 2-3.

Michels does not directly address the opinions of Mr. Casey until page 6 of his ten-page report, █████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████ *See* March 30, 2018 Opinion (ECF No. 149) at 75.  None of the discussion in the first 60% of the Report ████████████████████████████

█████████████████████████████████████████████████████ even

---

[16] Michels admits that his opinions must be limited to rebutting Mr. Casey's testimony.  *See* Dep. Tr. 89:14-90:5-9 ("Q.  Now, your understanding is that you were retained to respond to CIBC's expert report of Craig Casey, correct?  A.  Correct.  Q.  And you – A.  And to determine economic, economic losses."); Dep. Tr. 90:5-9 ("Q.  So you understand that the nature and the scope of your report is limited to rebuttal, correct?  A.  To rebuttal and to economic damages. Economic losses, excuse me.").

purports to rebut the contents of the Casey Report.  Therefore, because the only arguably relevant opinions in the Report are beyond the scope of rebuttal testimony, the Michels Report should be excluded in its entirety.

### B.   Michels Opines Outside of His Accounting Expertise

To the extent the Report is considered for any purpose, many of Michel's opinions exceed the scope of his accounting expertise.  It is axiomatic that "[a] person must be qualified to testify as an expert" and that "[t]he testimony that an expert witness gives must be within the scope of his or her expertise."  *Leon v. Kelly*, Civ. Act. No. 07-0467, 2009 WL 1300936, at *13 (D.N.M. Jan. 12, 2009).  Thus, an accounting expert may not proffer "conclusions that do not directly tie into h[is] accounting background."  *Clientron Corp. v. Devon IT, Inc.*, Civ. Act. No. 13-05634, 2016 WL 1255218, at *2 (E.D. Pa. Mar. 29, 2016).  Michels repeatedly strays outside the confines of his accounting expertise, as set forth in detail below.

### 1.   Opinions concerning "sound banking practices"

Without any reference whatsoever to accounting standards, Michels concludes that ▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Report at 8.  Setting aside the dubious merits of this legal conclusion, Michels admits that he (i) lacks any expertise in banking practices, (ii) was not retained to provide opinions on banking practices, and (iii) did not review the foundational information cited in Fellheimer's Expert Report on banking practices.  *See* Dep. Tr. 163:9-24.[17]  Thus, Michels admits that he is not qualified to testify with respect to banking practices.

---

[17] "Q.  So you're not an expert on what is and isn't a sound banking practice, correct?  A. Correct.  Q.  Did you review all of the evidence that was cited in Mr. Fellheimer's initial report in preparing your report?  A.  No."  Mr. Fellheimer is the Juliano Parties' other purported expert who also lacks the required level of expertise to offer an opinion concerning the alleged banking

### 2.    Opinions concerning architectural and construction plans

Although Michels concludes that ████████████████████████████
████████████████████████████████████████████ (Report at

8), he admits that his professional responsibilities do *not* involve the assessment of construction

or architectural plans, nor is he qualified to make such assessments.  *See* Dep. Tr. 175:24-176:7.

Thus, Michels admits that he is not qualified to opine on the detail and sufficiency of any

purported construction budgets or architectural plans submitted to CIBC.

### C.    Improper Legal Conclusions

Not only are many of Michels's opinions biased, unqualified, and beyond the scope of his

rebuttal engagement, but he also routinely states improper legal conclusions which invade the

province of the Court.  The "prohibition on experts testifying as to their own legal conclusions is

so well established that it is often deemed a basic premise or assumption of evidence law—a

kind of axiomatic principle."  *Holman Enters. v. Fid. Guar. Ins. Co.*, 563 F. Supp. 2d 467, 472

(D.N.J. 2008) (citations and quotations omitted).  In fact, Michels fully acknowledges that "no

one "should interpret the law for the judge."  (Dep. Tr. 185:21-23).  Nevertheless, the Report

advances legal conclusions mirroring the litigation positions adopted by the Juliano Parties.

Further, Michels makes the fatal admission that such legal arguments were added to his Report

by the counsel for the Juliano Parties upon their review of an initial draft of the Report.[18]

_____

practices the Juliano Parties have placed at issue and who, as a commercial litigator, offers
nothing other than arguments and legal conclusions in his report.  CIBC has simultaneously
moved to exclude Mr. Fellheimer's expert testimony.

[18] *See* Dep. Tr. 85:9-86:2 ("Q.  Was any of the substance of that first draft of your report changed
based on those discussions with counsel?  A.  Yes."); 84:5-8 ("Q.  . . .  When you were asked to
make substantive changes to your initial draft report, you made those changes, correct?  A.  I
don't recall exactly.  *I think the substantive changes were maybe legal issues that they  -- that
exceeded my limitation as an expert*.") (emphasis added).

As explained above, Michels strays far beyond his accounting expertise to conclude that,

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████ Report at 8 (emphasis added).  Not only are these

opinions unqualified given Michels's accounting background, but the opinions regarding ██████

███████████████████████████ plainly run afoul of the prohibition against experts opining

that a party breached disputed legal or contractual duties.  *See Perez v. First Bankers Trust*

*Servs., Inc.*, Civ. Act. No. 12-4450, 2015 WL 5722843, at *4 (D.N.J. Sept. 29, 2015) (excluding

expert opinions as to "ultimate legal issues . . . [because] any legal opinion [a party] would like

to provide the Court should be done through proper briefing, not expert opinion").   The

assessment of such legal and issues are the exclusive province of the Court and Michels's

opinions and conclusions as to these alleged breaches must be excluded.

## POINT III

## MICHELS'S DAMAGES CALCULATIONS ARE FUNDAMENTALLY FLAWED

Even where Michels attempts to proffer rebuttal opinions limited to his accounting

expertise, he fails to articulate admissible opinions because his calculations are fundamentally

flawed.  Accounting testimony is inadmissible if it "makes several significant errors that render

[the] testimony unreliable."  *JMJ Enters., Inc. v. Via Veneto Italian Ice, Inc.*, Civ. Act. No. 97-

cv-0652, 1998 WL 175888, at *9 (E.D. Pa. Apr. 15, 1998), *aff'd*, 178 F.3d 1279 (3d Cir. 1999)

(citation omitted); *see also Warren Distrib. Co. v. InBev USA L.L.C.*, Civ. Act. No. 07-1053,

2010 WL 2179167, at *4 (D.N.J. May 28, 2010) (accounting testimony may not "be based on

assumptions that are blatantly incorrect") (citations and quotations omitted).    Michels's

calculations of the Juliano Parties' alleged economic losses are rife with blatant, significant errors which render his conclusions unreliable and thus inadmissible.

### A. Unfounded And Improper Conclusions Concerning Mitigation Of Damages

Where Michels purports to calculate the amount of economic losses recoverable by the Juliano Parties, his calculations are unreliable because he fails to meaningfully analyze whether the Juliano Parties mitigated their alleged losses.

### 1. Michels improperly concludes that mitigation is not required by law

As a threshold matter, Michels (parroting Fellheimer), opines summarily that



Report at 8.  This (erroneous) legal conclusion must be excluded as an improper subject for expert testimony.  *See* section II.C., *supra*.

### 2. Michels fails to perform any systematic mitigation analysis

Although Michels concludes in his Report that ███████████████████████ , he subsequently conceded that an allegedly injured party is obligated to take steps to mitigate its damages.  *See* Dep. Tr. 15:2-5.  Nevertheless, Michels also concedes that he failed to undertake any analysis of efforts the Juliano Parties may have taken to mitigate damages.  *See* Dep. Tr. 18:7-9.  For example, Michels never sought to determine what financial penalties would have been incurred by the Juliano Parties if they had completed the Build-Out and delivered the Leased Premises to the Tenants after the Delivery Dates required by the Leases.  *See* Dep. Tr. 181:3-11.  Instead, Michels simply relied upon the Julianos' purely conclusory representations that mitigating damages at Grande Village was not feasible.

As explained in section I.C., *supra*, it is improper for an expert to simply rely upon the representations of an interested party, as opposed to conducting an independent analysis. Instead, an expert must rely upon the types of credible information ordinarily referenced by an expert in his particular field. *See Wonderland Nurserygoods Co., Ltd. v. Thorley Indus., LLC*, Civ. Act. No. 12-196, 2013 WL 6328772, at *3 (W.D. Pa. Dec. 5, 2013). Yet, Michels relies solely upon the representations of his own clients (*see* Dep. Tr. 181:23-182:12) in opining that,

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████ Report at 8.

Blindly accepting the Julianos' statements about delayed delivery costs and penalties hardly constitutes an expert analysis. Further, because Michels admits that he has not developed an opinion as to *when* CIBC became "obligated" to make Subsequent Advance Funds available to Grande Village (*see* Dep. Tr. 188:6-10), he fails to provide a reference date against which to calculate hypothetical delays and costs to try to remedy his fundamentally flawed mitigation analysis. Therefore, Michels offers no reliable methodology for opining on the economics of a delayed delivery of the Leased Premises at Grande Village. This failure to conduct a proper mitigation analysis makes Michels's ultimate conclusions as to potentially recoverable damages entirely unreliable.

**B.      Failure To Connect The Juliano Parties' Alleged Losses to CIBC's Conduct**

Despite admitting that a damages expert must identify a causal link between allegedly harmful conduct and damages (*see* Dep. Tr. 12:4-12; 223:6-10), Michels fails to connect any of the economic losses purportedly suffered by the Juliano Parties to CIBC's allegedly harmful conduct.

-16-

**1.      Michels fails to establish a causal connection between CIBC's conduct and a decline in the value of Grande Village**

Michels fails to connect CIBC's conduct to an alleged loss of value at Grande Village.  In fact, because he has not determined the incremental value the Leases might have added to Grande Village (*see* Dep. Tr. 200:14-201:5)[19] he necessarily fails to determine how conduct which allegedly caused the loss of the Tenants negatively impacted the value of Grande Village.

**2.      Michels fails to establish a causal connection between CIBC's conduct and alleged out-of-pocket expenses incurred by Grande Village**



Michels also opines that [REDACTED] Report at 9. [REDACTED] Report at 9. [REDACTED] Michels admits that "original site work costs" at Grande Village were incurred in or around 2005, long before the occurrence of any disputed events relevant to this litigation.  *See* Dep. Tr. 204:16-205:25.  Therefore, the Juliano Parties did not incur these expenses as a result of the Build-Out or any allegedly harmful conduct by CIBC.  See Dep. Tr. 206:21-207:8.[20]

**C.      Flawed Analysis Of The Juliano Parties' "Equity Contributions"**

Michels  concludes  that [REDACTED]



[REDACTED]

---

[19] "Q.  Have you independently calculated the incremental value of the [Leases] to Grande Village?  A.  No.  I – no.  Q.  Did you rely on someone elses's calculations?  A.  I – yes, I believe I relied on the – that Marcus & Millichap valuation.  Q.  What is the incremental value of the West Marine and state of New Jersey leases to Grand Village?  A.  I'm just looking – I don't believe – I don't believe that – I don't believe I have those values set forth in my report with respect to those two leases."

[20] Further, Michels concedes that the original site work continues to be accretive to the value of the Property and, thus, does not constitute "damage" to Grande Village.  *See* Dep. Tr. 208:17-21.

-17-

██████████████████████████████████████████████████████████

████████████████████████████████████████ Report at 9.   Numerous

fundamental flaws undermine this conclusion.

*First*, Michels admits that no "loss of equity" has occurred because the Juliano Parties

continue to own and operate the Properties.  *See* Dep. Tr. 220:24-221:17.[21]   Further, Michels

concedes that the Juliano Parties must first pay off all debts encumbering the Properties before

they can realize any value from their equity contributions.  *See* Dep. Tr. 228:14-19.[22]  Thus, the

purported value of the Juliano Parties' "equity contributions" has neither been realized nor lost,

and, therefore, that value may not be claimed as damages in these Actions.

*Second*, Michels's opinion as to the amount of these economic losses is flawed.  For

example, although he concludes that the Juliano Parties are entitled to recover $24,620,481 in

lost "equity" at Grande Properties, he concedes that this amount represents a combination of

roughly $16 million in actual equity contributions and more than $8 million from the estimated

*value* of the Starbucks and Miller's Ale House at the Property.  Specifically, Michels states that:

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ Report at 9.  Michels admitted at his deposition that

this $8,200,000 figure greatly exceeds any "equity" contribution made in connection with the

Starbucks and Miller's Ale House (such contributions totaled only a few hundred-thousand

---

[21] "Q.  So as of this point, the borrowers haven't actually realized any actual losses on the properties, correct?  A.  That's correct.  But the theory behind the loss of equity is that CIBC's behavior was such that if the properties are lost, then that equity which should not have been lost will be lost.  Q.  But that's all speculative at this point, correct?  MR. GARBER:  Objection to the form.  Q.  Or at this point, that is speculative, correct?  A.  Yes.  But it is a real damage if, in fact, that happens.  Q.  But it hasn't, correct?  A.  Correct."

[22] "Q.  . . . for the Juliano parties to realize any value in their equity investments in Grande Properties, they would first have to pay off the debt that encumbers the property?  A.  Yes."

dollars).  *See* Dep. Tr. 227:17-228:5.[23]   Thus, Michels knowingly overstates the alleged equity

contribution in Grande Properties by roughly 50%—a  material and fundamental flaw in his

methodology.

      *Third*, the Juliano Parties' "equity contributions" were made not *because* of any conduct

by CIBC; instead, such contributions occurred prior to the events at issue and mostly before

CIBC became a lender on the Properties.  Indeed, these equity contributions were made before

Grande Properties had even entered into a lending relationship with CIBC, as the Julianos have

owned that Property for nearly 30 years.  *See* Dep. Tr. 225:2-7.  The equity contributions to

Willingboro and Grande Village were, likewise, made largely before CIBC lent any money to

those Borrowers.  *See* Dep. Tr. 225:2-7; 230:14-232:6.  As such, the Juliano Parties did not incur

the "cost" of these contributions as a *result* of any conduct by CIBC.

      *Fourth*, Michels admits that the Juliano Parties' equity contributions added value to the

Properties which has, in turn, benefitted the Juliano Parties throughout their ownership and

management of the Properties.  *See* Dep. Tr. 225:8-17; 227:10-228:13.  Nevertheless, Michels

undertakes no analysis to quantify these benefits as an offset to the alleged loss of equity.

Therefore, Michels necessarily overstates the amount of any supposedly "lost" equity.

      For all these reasons, Michels's estimations of lost equity are fundamentally flawed and

should be excluded.

---

[23] "Q.  So you're not concluding that the Juliano parties invested 8.2 million dollars of their own funds in connection with the two tenants?  A.  That's correct, yes.  They invested – yes.  But Grande Properties paid for most if not all of the additions for those two properties.  Q.  And do you know how much that was?  A.  I do not off the top of – a few hundred thousand dollars, several hundred thousand dollars."

### D.      Reliance Upon Unverified And Untested Data

Many of Michels's calculations of economic losses allegedly incurred by the Juliano Parties are inadmissible because they rely on unverified data lacking the required level of accounting expertise.

### 1.      Failure to verify the accuracy of appraised values at Grande Village

Michels improperly relies on untested appraisal values to calculate a supposed loss in value at Grande Village.  Courts hold that an accountant with no specific qualifications in real estate appraisals may not provide expert testimony concerning values derived from untested real estate appraisals.  *See United States v. 99.66 Acres of Land*, 970 F.2d 651, 657 (9th Cir. 1992) (excluding testimony from accountant who "was not qualified as an expert in appraisal and was merely calculating numbers provided by [party] that were not independently established as valid" because accountant's "lack of training or practice as an appraiser and his personal unfamiliarity with the data demonstrate that he is not qualified to present expert witness testimony").

Michels violates these admissibility standards by relying upon two untested appraisals of Grande Village to conclude that, ███████████████████████████████████████████████████████████████████████████████████████ Report at 9.  Michels is not trained to perform real estate appraisals, and he admits that he did nothing to verify the accuracy of the Grande Village appraisals upon which he relies. *See* Dep. Tr. 196:10-24; 201:24-202:3 ("I didn't perform the appraisal.  I didn't perform any calculations.  I just – I used the valuations that were provided to CIBC.").  These untested values lack the necessary reliability to support an expert opinion on alleged damages incurred by Grande Village.[24]

---

[24] Among many other problems, this failure to investigate the underlying assumptions and data for the property valuations upon which he relies makes it impossible for Michels to determine

### 2. Failure to prove that invoices relating to the Build-Out were paid

Just as Michels made no effort to test the reliability of the Grande Village appraisals he cites, he undertook no investigation into whether invoices purporting to evidence costs incurred by Grande Village in connection with the Build-Out were actually paid.  *See* Dep. Tr. 191:19-23. Michels recognizes that this omission is inconsistent with the practices of forensic accounting experts who ordinarily verify that similar invoices have been paid.  *See* Dep. Tr. 192:10-19. Thus, Michels fails to perform a diligent analysis commensurate with the standards of experts in the accounting field, and his calculations concerning costs incurred by Grande Village must be excluded.  *See In re Johnson*, 900 F. Supp. 2d at 493 (expert must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.") (citations omitted).

### E. Failure To Account For The Costs Of Completing The Build-Out

Michels's faulty financial assumptions infect all of his estimations of purported economic losses incurred by the Juliano Parties.  Nowhere is this clearer than ███████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████ Report at 10 (original emphases).

In support of this conclusion, ████████████████████████████████ ████████████████████████████████████████████████████

_____

whether he has double-counted certain alleged damages—such as the Juliano Parties' supposed "out-of-pocket expenses" at Grande Village.  *See* Dep. Tr. 209:20-210:17 ("So you can't tell, based on your review, whether the 10 and a half million dollar appraisal incorporated value in costs associated with the out-of-pocket expenses for the build-out?  A.  No, no, cannot."). Further, because Michels never independently determined the incremental value of the Leases to Grande Village, he is unqualified to opine on what portion of any decline in the value of Grande Village may be attributable to the loss of the Tenants.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████ Michels admits that these additional

Build-Out costs would constitute new debt owed to CIBC:  as such, the Juliano Parties cannot

recover this amount as "damages."  *See* Dep. Tr. 203:7-204:4.[25]  He further admits that

increasing the Grande Village "Loan Balance" by $2 million would undermine his entire

conclusion because the combined value of the Properties would then be roughly $1.7 million *less*

than the amount of the Juliano Parties' debt to CIBC.  *See* Dep. Tr. 237:17-238:20.[26]

Michels and the Juliano Parties cannot have their cake and eat it, too.  If Michels is to

assume the completion of the Build-Out, he must also account for its costs.  "A reasonable

accountant does not report certain expenses, and choose to omit other, like expenses."  *JMJ*

*Enters.*, Civ. Act. No. 97-cv-0652, 1998 WL 175888, at *10 (E.D. Pa. Apr. 15, 1998), *aff'd*, 178

F.3d 1279 (3d Cir. 1999).  Where an accounting expert picks-and-chooses which expenses to

report, he "is simply presenting [a party's] unrealistic hopes through the mouth of an expert."

---

[25] "Q.  You're aware of the fact that the subsequent advance was in the amount of approximately 2 million dollars, correct?  A.  The subsequent – the subsequent advance by CIBC?  Q.  Yes.  A. Yes.  Q.  And those were CIBC funds, right?  A.  Yes, certainly.  I understand your question.  Q. So it wouldn't have been appropriate to include that 2 million dollars in your damages calculation, correct?  A.  That 2 million dollars would be debt that would have been owed by Grande Village, if that's your question.  Q.  Right, so it would not be damages, correct?  It's debt as opposed to damages, correct?  **A.  That 2 million would be owed to CIBC, but – yes, yes, that's correct.**"  (emphasis added).

[26] "Q.  Now, had CIBC disbursed a subsequent advance in connection with that construction, the loan balance would have increased by nearly 2 million dollars, correct?  A.  Correct.  Q.  Now, have you increased the loan balance of 6.4 million dollars by 2 million dollars?  A.  I did not. . . .  Q.  If that were to occur, the combined value of the properties at the time of the March 3, 2014 notice defaults would not have been greater than the loan balances, correct?  A.  Correct."

*Id.*[27]  Michels must not be permitted to present admittedly and fundamentally flawed analyses which merely seek to disguise as "expert opinions" the Juliano Parties' unrealistic and inequitable hopes for a windfall at CIBC's expense.

## CONCLUSION

For the foregoing reasons, CIBC respectfully submits that the Court should exclude Mr. Michels's proffered expert testimony in its entirety.

---

[27] Tellingly, but without specifically identifying which alleged damages calculations he altered, Michels admits that he revised his damages calculations upwards after consulting with the Juliano Parties' litigation counsel.  *See* Dep. Tr. 85:9-86:2 ("Q.  Was any of the substance of that first draft of your report changed based on those discussions with counsel?  A.  Yes."; Dep. Tr. 84:5-8 ("Q.  Did you change any of the numbers that appeared in the first draft of your report based on that meeting?  I believe I did, yes.  Q.  Which numbers did you change?  I had some questions, there were some issues on the damage calculation that the Braverman firm clarified for me.  Q.  Did you revise any of those damages numbers upwards?  A.  Yes.").

Dated:  May 21, 2018

CHIESA SHAHINIAN & GIANTOMASI PC


By:   s/ Adam K. Derman
     Adam K. Derman
     David M. Dugan
     CHIESA SHAHINIAN & GIANTOMASI PC
     One Boland Drive
     West Orange, NJ 07052

     Jean-Marie L. Atamian
     Jordan Sagalowsky
     1221 Avenue of the Americas
     New York, New York 10020
     (212) 506-2500
     *Attorneys for CIBC Inc. and Canadian*
     *Imperial Bank of Commerce,*
     *New York Agency*